ACCEPTED
14-14-00819-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
2/19/2015 3:03:13 PM
CHRISTOPHER PRINE
CLERK

# NO. 14-14-00819CV

_____

**IN THE
COURT OF APPEALS
FOR THE
FOURTEENTH COURT OF APPEALS DISTRICT
OF
TEXAS
AT HOUSTON**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

2/19/2015 3:03:13 PM

CHRISTOPHER A. PRINE  Clerk

_____

**SAN SEBASTIAN REALTY CO., INC.,**
Appellant

v.

**ROEL HUERTA, and ROSA M. HUERTA**,
Appellees

_____

Appealed from Cause No. 1043170; In the County Civil
Court at Law No. Three (3). Harris County, Texas

_____

**BRIEF FOR APPELLANT**
_____

James L. Supkis
Texas Bar No. 19516800
Attorney for Appellant
P.O. Box 58243
Houston, TX 77258
(281) 723-9964
(713) 645-6618 (fax)

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**San Sebastian Realty Co., Inc., Appellant**

Trial and Appellate Counsel:

James L. Supkis
P.O. Box 58243
Houston, TX 77258
(281) 723-9964
(713) 645-9138 (fax)


**Roel Huerta, and Rosa M. Huerta, Appellees**

Trial and Appellate Counsel:

Mark E. Lewis
Texas Bar No. 12299100
3730 Kirby Drive, Suite 1030
Houston, TX 77098
(713) 936-9285
(832) 916-2400 (fax)

## RELATED CASE(S)

A related case is Cause No. 2014-18363; Richard Nichols v. Rosa Huerta; In the District Court, 164th Judicial District of Harris County, Texas.

# TABLE OF CONTENTS

Identity of Parties and Counsel ….                                    i

Related Case(s) ….                                                    ii

Index of Authorities ….                                               vi

Note on Record References ….                                          x

Statement of the Case ….                                              1

Statement Regarding Oral Argument ….                                  4

Points of Error Presented for Review ….                               5

Statement of Facts ….                                                 5

Summary of the Argument ….                                            10

Argument ….                                                           12

**POINT OF ERROR I: THE TRIAL COURT ERRED
IN GRANTING THE APPELLEES' OBJECTIONS
TO APPELLANT'S SUMMARY JUDGMENT EVIDENCE.** ….        12

    **A.**     **All objections except as to the first affidavit of
Gene Surrency were waived by the October 2
summary judgment.** ….                                                12

    **B.**     **Appellees' two December Motions to Modify
Judgment, and for a Ruling on Objections, and
29 and 31 December letters requesting that the
trial court vacate its 2 October final judgment
and issue a new summary judgment were untimely.** ….   15

        **1.**     **Appellees' December 3rd Motion to Modify
Judgment is governed by Texas Rule of
Civil Procedure 329b; L.M. Healthcare, Inc.
v. Childs, 929 S.W.2d 442 (Tex. 1996).** ….            15

2.  Appellees' December 29 and 31, 2014 letters requesting the trial court to vacate and render a new judgment were not proper/ timely made due to Texas Rule of Civil Procedure 329b; L.M. Healthcare, Inc. v. Childs, 929 S.W.2d 442 (Tex. 1996). ….    16

3.  The trial court's December Ruling on the Appellees' objections was untimely because it was issued more than 2 months after the first summary judgment. ….    17

4.  Appellees' Motion for Ruling on Appellees' Objections to Appellant's Summary Judgment Evidence, filed on December 3, was an untimely request for Conclusions of Law per Texas Rule of Civil Procedure 296. ….    19

C.  The trial court's December 16 Ruling on Objections to Appellant's Summary Judgment Evidence and January 6 Order Granting Appellees' Motion for Summary Judgment and Final Judgment were an abuse of discretion. ….    20

D.  The Appellees' Objections are not valid. ….    21

    1.  Objections to Appellant's Motion for Summary Judgment evidence are not valid. ….    21

       a.  May 7 Affidavit of Mr. Surrency ….    21

       b.  Letter to Mr. and Mrs. Huerta from Mr. Nichols' attorney ….    24

       c.  Mr. Nichols' check sent as earnest money ….    24

    2.  Objections to Appellant's Reply to Appellees'

Cross-Motion for Summary Judgment
evidence are not valid. ….     25

    a.     June 6 Affidavit of Mr. Surrency ….     25

    b.     Letter to Mr. and Mrs. Huerta from
Mr. Nichols' attorney ….     27

    c.     Mr. Nichols' check sent as earnest money ….     27

POINT OF ERROR II: THE TRIAL COURT ERRED IN
GRANTING SUMMARY JUDGMENT FOR APPELLEES. ….     28

    A.     Summary judgment standard of review ….     28

    B.     If Appellees' objections to evidence are determined
to be invalid, then there is controverting evidence. ….     30

    C.     If Appellees' objections are determined to
be valid, then Appellee's  summary judgment
evidence created material issues of fact. ….     31

POINT OF ERROR III: THE TRIAL COURT ERRED BY
DENYING THE APPELLANT DUE PROCESS. ….     32

    A.     Due process requires meaningful notice, a fair trial,
and a fair and impartial judge. ….     32

    B.     The Court considered two requests from the
Appellees that were letters, not motions. ….     33

Prayer ….     37

Certificate of Compliance ….     38

Certificate of Service ….     38

Appendix ….     attached

# INDEX OF AUTHORITIES

**TEXAS STATUTES**

Texas Code of Judicial Conduct, Canon 3 (B) (8) …        34

**Texas Rules**

Tex. R. App. P. 33.1 (a) (2) (A) ….        13

Tex. R. Civ. P. 166a (c) ….        30

Tex. R. Civ. P. 166a (f) ….        14

Tex. R. Civ. P. 296 ….        20, 33

Tex. R. Civ. P. 329b ….        16, 33

Tex. R. Evid. 103 (a) (1) ….        25

Tex. R. Evid. 801 (d) ….        22

Tex. R. Evid. 801(e) (2) ….        23, 24

Tex. R. Evid. 801 (e) (2) (D) ….        26

Tex. R. Evid. 803 (6) ….        24, 27

**CASES**

**U.S. Supreme Court**

Fuentes v. Shevin, 407 U.S. 67, 80 (1972) ….        34

In re Murchison, 349 U.S. 133 (1955) ….        34

Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988) ….        34, 37

## Index of Authorities (cont'd.)

Peralta v. Heights Medical Center, Inc., 485 U.S. 80, 84 (1988) ….    32, 36

Tumey v. Ohio, 273 U.S. 510 (1927) ….    34

Ward v. Village of Monroeville, 409 U.S. 57 (1972) ….    34

Wolff v. McDonnell, 418 U.S. 539 (1974) ….    32

**Texas Supreme Court**

Beaumont Bank, N.A. v.Buller, 806 S.W.2d 223, 226 (Tex. 1991) ….    12, 20

City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex. 1995) ….    12, 20

Farmer v. Ben E. Keith Co., 907 S.W.2d 495 (Tex. 1995) ….    15

Huckabee v. Time Warner Entertainment Co., L.P., 19 S.W.3d 413 (Tex. 2000). ….    30

In re J.F.C., 96 S.W.3d 256, 300 (Tex. 2002), (Schneider, J., dissenting) ….    32

L.M. Healthcare, Inc. v. Childs, 929 S.W.2d 442 (Tex. 1996) ….    iii, iv

Seymour v. Gillespie, 608 S.W.2d 897, 898 (Tex. 1980) ….    25

Rogers v. Bradley, 909 S.W.2d 872 (Tex. 1995) ….    (n. 9) 36

Valence Operating Company v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005) ….    12, 28

**Texas Courts of Appeals**

Dolcefino v. Kelley; 19 S.W.3d 906, 925 (Tex. App.-Houston [14[th] Dist.] 2000, pet. denied) ….    14, 17

# Index of Authorities (cont'd.)

Eaton Metal Products v. U.S. Denro Steels, No. 14-09-00757-CV
(Tex. App.-Houston [14th Dist.] 2010, n.w.h.) (mem. op., not
designated for publication) ….                                       17

Esty v. Beal Bank S.S.B., 298 S.W.3d 280, 295 (Tex. App.-Dallas
2009, no pet.) ….                                                    15, 17

GT & MC, Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 257-58
(Tex. App.-Houston [1st Dist.] 1991, writ denied) ….                 24, 27

Hernandez v. Lopez, 288 S.W.3d 180, 184-85 (Tex. App.–Houston
[1st Dist.] 2009, no pet.) ….                                        19, 36

Hogan v. J. Higgins Trucking, Inc., 197 S.W.3d 879 (Tex. App. Dallas
2006, no pet.) ….                                                    19

Mason v. State, 771 S.W.2d 561 (Tex. Cr. App. 1989, no writ) ….      37

Metzger v. Sebek, 892 S.W.2d 20, 37-8 (Tex. App.-Houston [1st Dist.]
1994, no pet.) ….                                                    32

Norton v. State, 755 S.W.2d 522 (Tex. App.-Houston [1st Dist.] 1988,
writ ref'd) ….                                                       37

Parkway Dental Associates, P.A. v. Ho and Huang Properties, L.P.,
391 S.W.3d 596, 603-04 (Tex. App.-Houston [14th Dist.] 2012, no pet.) ….   13, 29

Petroleum Analyzer Company v. Olstowski, 01-09-00076-CV
(Tex. App.-Houston [1st Dist.] 2010, n.w.h.) (mem. op., not designated
for publication) ….                                                  25

Rosas v. State, 76 S.W.3d (Tex. App.-Houston [1st Dist.] 2002, no writ) ….   37

SSP Partners v. Gladstrong Investments (USA) Corporation,
169 S.W.3d 27, 34 (Tex. App.-Corpus Christi-Edinburg 2005, pet.
granted) ….                                                          13

# Index of Authorities (cont'd.)

Trevino v. Brookhill Capital Resources, Inc., 782 S.W.2d 279, 281
(Tex. App.-Houston [1st Dist.] 1989, writ denied) ….          (n. 5) 22

Well Solutions, Inc. v. Stafford, 32 S.W.3d 313, 317 (Tex. App.-
San Antonio, 2000, no pet.) ….          14

WMC Mort. Corp. v. Starkey, 200 S.W.3d 749, 51 (Tex. App.-
Dallas 2006, pet. denied) ….          15

Wolfe v. Devon Energy Production Company, 382 S.W.3d 434, 448
(Tex. App.-Waco 2012, pet. filed) ….          17

# <u>NOTE ON RECORD REFERENCES</u>

There is an original Clerk's record, dated December 1, 2014; this is referenced as C.R. In addition, there is a supplement dated January 7, 2014, which is referred to as 1 Suppl. There is a second supplement dated February 5, 2015, which is referred to as 2 Suppl. Finally, there is a third supplement, dated February 11, 2015; this is referenced as 3 Suppl.

The Reporter's Record is referred to as R.R.

All of these files are on the cd in the envelope marked 13 February 2015.

**NO. 14-14-00819CV**
_____

**IN THE
COURT OF APPEALS
FOR THE
FOURTEENTH COURT OF APPEALS DISTRICT
OF
TEXAS
AT HOUSTON**
_____

**SAN SEBASTIAN REALTY CO., INC.**,
Appellant

v.

**ROEL HUERTA, and ROSA M. HUERTA**,
Appellees
_____

Appealed from Cause No. 1043170; In the County Civil
Court at Law No. Three (3). Harris County, Texas

_____

**BRIEF FOR APPELLANT**
_____

**TO THE HONORABLE COURT OF APPEALS:**

**STATEMENT OF THE CASE**

This is a suit for damages by a real estate broker based on two contracts: a

commission contract, and a lease agreement. C.R. at 4. Both parties agreed that the

Appellant's sales commission was earned per the commission contract, but

disagreed about whether it was payable per the lease. C.R. at 68. Both parties

1

moved for summary judgment. C.R. at 15, 68. The trial court granted summary judgment in favor of the Appellees (C.R. at 196), and the Appellant filed a Notice of Appeal (C.R. at 200), and then a Motion for New Trial (C.R. at 202).

Over 30 days after the summary judgment, the Appellees filed a motion to modify the summary judgment to include a statement that their objections were sustained (1 Suppl. at 4), and a motion for a ruling on Appellees' objections to Appellant's summary judgment evidence (1 Suppl. at 6). On December 16, 2014, the last day of plenary jurisdiction, the trial court issued a one sentence ruling stating that all of Appellees' objections to the Appellant's summary judgment evidence were sustained. 1 Suppl. at 13.

Immediately prior to the 2015-New Year's holiday, and the weekend following, the Appellees' counsel wrote two letters to the trial court (on December 29, and 31) (2 Suppl. at 8, 14), asking Judge Storey to vacate her earlier summary judgment, and issue a new judgment containing the statement that all of Appellees' objections to the Appellant's motion for summary judgment were sustained. The justification given by the Appellees for the new judgment was to attempt to defeat Appellant's arguments on appeal. Appellant's counsel received the December 29 and 31 2014 letters on Tuesday, January 6, 2015. That same day, Appellant's counsel wrote and filed a letter response that was too late by about six hours. 2 Suppl. at 16. On Tuesday morning, without a written motion, and without a hearing

or submission date, the trial court granted the Appellees' request, and signed an order vacating its earlier summary judgment, and issuing the Appellees' proposed new summary judgment. 2 Suppl. at 19.

## STATEMENT REGARDING ORAL ARGUMENT

This is a case where due process was violated.[1] Months after final judgment was entered, and after Appellant's motion for new trial was overruled by operation of law, Appellees' counsel contacted the trial court by sending two letters through the mail, not a filed motion, and presented "proof" to Judge Storey. 2 Suppl. at 8, 14. Based upon that "proof," counsel asked for and received relief in the form of a vacated judgment and entry of a new judgment (2 Suppl. at 19) without a submission date nor a hearing date. These events occurred at or over the New Year's holiday weekend. Appellant's right to a reasonable opportunity to be heard before an impartial judge was denied. Appellees' "proof" and argument clearly placed Judge Storey into the role of an advocate against Appellant because the purpose of the January 6, 2015-judgment was to defeat Appellant's argument on appeal. Appellant's remedy on appeal for the denial of due process creates issues of recusal upon remand, and a request for a mandate that Judge Storey recuse herself upon remand.

---

[1] Other grounds for reversal exist. However, counsel does not believe that oral argument is necessary on those other grounds for reversal.

## POINTS OF ERROR PRESENTED FOR REVIEW

**POINT OF ERROR I: THE TRIAL COURT ERRED IN GRANTING THE APPELLEES' SUMMARY JUDGMENT OBJECTIONS TO APPELLANT'S EVIDENCE.**

**POINT OF ERROR II: THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES.**

**POINT OF ERROR III: THE TRIAL COURT ERRED BY DENYING THE APPELLANT DUE PROCESS.**

## STATEMENT OF FACTS

At all times material to this action, the Plaintiff/Appellant was (and is currently) duly licensed as a real estate broker by the Texas Real Estate Commission. C.R. at 15, 26, 33, 147. On or about November 30, 2011, Appellant and the Appellees made a written contract in Houston, Texas, styled as "Commercial Real Estate Listing Agreement". Id. The Appellant agreed to render the usual services of a real estate broker in procuring a buyer for the Appellees' real property, located in Harris County, Texas, (TR 2A BLK 18, PARK PLACE VILLA, commonly known as 8304 Park Place Boulevard, Houston, TX 77017), according to certain terms and conditions specified in the contract. Appellees agreed that the Appellant would be their sole and exclusive agent to sell the property, and would have the sole and exclusive right and authority to sell the property.

5

According to the Listing Agreement, the Appellant was to receive a fee of six percent (6%) of the selling price when:

(1) Seller sells, exchanges, or agrees to sell … the Property to anyone at any price on any terms;

(2) Broker … procures a buyer ready, willing, and able to buy all or part of the Property at the Listing Price or at any other price acceptable to Seller; [or]

(3) Seller grants or agrees to grant to another person an option to purchase all or part of the Property.

The Listing Agreement also states:

If, during this Listing, Broker procures a tenant to lease all or part of the Property and Seller agrees to lease all or part of the Property to tenant, Seller will pay Broker at the time the lease is executed [a fee of 6% of all base rents to be paid over the term of the lease]. If, during the term of the lease, the tenant agrees to purchase all or part of the Property, Seller will pay Broker [a fee of 6% of the sales price].

Finally, the Listing Agreement provides that "all Sellers executing this Listing are jointly and severally liable for the performance of all its terms".

On or about November 7, 2012, the Appellees, represented by the Appellant, executed a "Commercial Lease" of their real property described above, to Richard Nichols, as the tenant. C.R. at 43, 156. The Commercial Lease provides for Mr. Nichols to have an option to purchase the property at a price of $125,000.00.

Mr. Nichols, through his attorney, gave notice to the Appellees of his intent to exercise the option provided in the Lease, and purchase the property, on or about July 17, 2013. C.R. at 61, 134. He later sent the Appellees a check in the

amount of $1,000.00 as earnest money, which was endorsed, and negotiated. C.R. at 62, 140.

On or about November 4, 2013, by certified mail, the Appellant, through its attorney, presented a claim for its broker's fee to the Appellees for payment. The Appellees, however, have failed and refused to compensate the Appellant according to the Listing Agreement (and have refused to convey the property to Mr. Nichols). C.R. at 16, 17, 26.

On January 27, 2014, the Appellant filed an Original Petition alleging the Appellees' breach of the Listing Agreement, and requested their damages and attorney's fees. C.R. at 4. On May 9, 2014, the Appellant filed a traditional motion for summary judgment, which was set for submission on June 6. C.R. at 15. The Appellees filed a response, and also a cross-motion for no-evidence summary judgment. C.R. at 68. The Appellees' response/cross motion had controverting summary judgment evidence attached to it. One affidavit was sworn to by Mrs. Rosa Huerta (C.R. at 81) where she admitted to the Listing agreement with the Appellant as well as the lease agreement with Mr. Nichols. Mrs. Huerta also admitted that she knew, independently, of Mr. Nichols' exercise of the option to purchase, and the letter from Mr. Nichols' attorney sent in strict compliance with the lease. Mrs. Huerta admitted to wrongfully applying Mr. Nichols' earnest money check as rent. Lastly, Mrs. Huerta admitted that she had not sold the

property to Mr. Nichols from July 2013 to July 31, 2014; a period of more than one year.[2] Appellees' set their cross motion for summary judgment for submission on June 20, 2014. C.R. at 68. The submissions were rescheduled to August 22, 2014 at the request of the court.

Meanwhile, the case was set for trial for the week of November 3. Counsel for the Appellant was notified that mediation was ordered for this case. Appellant then filed a motion on September 30 requesting to avoid the requirement for mediation, in that summary judgment motions had been filed, but not ruled on. C.R. at 193. On October 2, the trial court granted the Appellees' motion for no-evidence summary judgment (C.R. at 196), and denied the Appellant's motion (C.R. at 199). The judgment in favor of the Appellees made no mention of objections made by the Appellees against the Appellant's evidence, included in the Appellant's motion for summary judgment, and in response to the Appellees' cross-motion for summary judgment.

The Appellant filed a Notice of Appeal on October 10, 2014 (C.R. at 200) and a Motion for New Trial on October 29, 2014 (C.R. at 202). On December 3, 2014 the Appellees filed a Motion to Modify Judgment (1 Suppl. at 6) and for Ruling on the Appellees'/Defendants' Objections to Plaintiff's (Appellant's Summary Judgment Evidence, to include, among other changes, a statement that

---

[2] The property has not sold as of the filing of this brief. See Appellees' counsel's letters dated December 29, and 31, 2014 with attachments.

the Appellees' objections had been sustained (1 Suppl. at 4). These motions were set for a hearing on December 10, 2014. That hearing was recorded. On December 16, 2014 the trial court signed a Ruling on Objections to Plaintiff's Summary Judgment Evidence, which states only that all of Appellees' objections had been sustained. 1 Suppl. at 13. The trial court did not note which of the two Appellees' motions came on for consideration or which one was granted.

On December 29 and 31, 2014, the Appellees' counsel wrote two letters to the court. 2 Suppl. at 8, 14. In those two letters counsel provided and discussed proof of Appellant's planned argument on appeal. Counsel asked that the trial judge vacate its October 2, 2014-summary judgment ruling in favor of the Appellees, and issue a new final judgment, containing a ruling on the Appellees' evidentiary objections, in order to defeat Appellant's argument on appeal. Counsel did not e-file his two letters. Counsel for the Appellant was served by regular mail, and received a copy of the letters on January 6, 2014.[3] Later that day, at about 9:00 p.m., Appellant's counsel sent a letter to the Court in response. 2 Suppl. at 16. However, Appellant's counsel later learned that the trial court had granted the Appellees' request, and signed their proposed final judgment, sometime between 11:15 am (as shown by the mechanical file stamp) (2 Suppl. at 19) and 4:06 pm (as

---

[3] There is no mention in the appellate record of when Appellant's counsel received the two letters other than the letter response that was filed on the evening of January 6, 2015. This is noted should any Justice on the Court of Appeals wonder about how much time Appellant's counsel had to respond.

shown by the "timed" docket sheet) the day on January 6, 2014 (3 Suppl. at 19). The trial court's "timed" docket sheet indicates that Appellant's counsel's January 6, 2014-letter was before the trial court at 2:55 pm. 3 Suppl. at 19. Such is impossible because the letter wasn't filed until later that evening.

## SUMMARY OF THE ARGUMENT

This is a case which presents problems with objections to summary judgment evidence that were not ruled upon at or near the time a summary judgment order was entered. Actually, there are two judgments: October 2, 2014 (C.R. at 196) and January 6, 2015 (1 Suppl. at 19). Two months after judgment, Appellees' counsel informed the trial court that the October 2, 2014-summary judgment could not stand without an order excluding Appellant's summary judgment evidence. 1 Suppl. at 4, 6. Both motions, filed by Appellees, in December 2014 were outside any applicable rule of procedure permitting Appellees to approach the trial court for a ruling. Acknowledging the lateness of Appellees' requests and noting she could not make substantive changes (R.R. at 3), Judge Storey nevertheless entered an order on December 16, 2014 sustaining all of the Appellees' objections. 1 Suppl. at 19.

After the December 16, 2014 order, Appellees' counsel once again approached Judge Storey, only this time by two mailed letters; December 29, and December 31, 2014. 2 Suppl. at 8, 14. Neither letter was e-filed, but old fashion,

"mechanical" file stamps indicate both letters were received by the court on January 6, 2015. Both letters presented Judge Storey with new evidence and asked for new relief; i.e. to vacate the October 2, 2014-summary judgment order and enter a new summary judgment order. The justification asserted was to defeat Appellant's argument on appeal. Without a motion, without a request for any kind of hearing, without three days notice to Appellant, Judge Storey did as Appellees asked by entering a new judgment on January 6, 2015, the same day the court filed the two letters. 2 Suppl. At 19.

The result of this unusual procedural history is a flawed judgment which holds that more than a year after a tenant exercised his option to purchase land, the Appellees had not sold the property as required in a lease, was within a "time of the essence" clause, and thus not a breach of lease. Accordingly, Appellant's earned commission was not payable.

# ARGUMENT

**POINT OF ERROR I: THE TRIAL COURT ERRED IN GRANTING THE APPELLEES' OBJECTIONS TO APPELLANT'S SUMMARY JUDGMENT EVIDENCE.**

Summary judgments are reviewed de novo on appeal. Valence Operating Company v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). There are two sets of Appellees' objections to Appellant's summary judgment evidence: the ones made on May 29, 2014 (C.R. at 74-77) and the ones made on June 16, 2014 (C.R. at 175-76). Those rulings on objections to evidence are reviewed on an abuse of discretion standard. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex. 1995). A trial court abuses its discretion when it acts without regard for any guiding rules or principles, or when the court acts in an "unreasonable or arbitrary manner." Beaumont Bank, N.A. v.Buller, 806 S.W.2d 223, 226 (Tex. 1991). In this case the trial court did not follow any rules in making her December 16th and January 6th orders.

### A. All objections except as to the first affidavit of Gene Surrency were waived by the October 2 summary judgment.

In the Appellees' Response to Appellant's Motion for Summary Judgment and Cross-Motion for Summary Judgment, the Appellees objected to the Appellant's Affidavit of Mr. Surrency. C.R. at 74-77. Objections were also made to a letter sent to the Appellees by an attorney for Mr. Nichols, the tenant and

prospective purchaser of the property, stating that he was exercising his option to purchase, and a copy of a check from Mr. Nichols that was negotiated by the Appellee, Rosa Huerta. C.R. at 77. Additionally, in the Appellees' Reply to Appellant's Response to Appellees' Motion for Summary Judgment, the Appellees objected to another Affidavit from Mr. Surrency, and again to the letter from Mr. Nichols' attorney, and to the check from Mr. Nichols that was negotiated by the Appellees. C.R. at 175.

The two competing motions for summary judgment were first set for submission in June 2014. They were both reset, per the request of the court, for August 22, 2014. So, the Appellees' objections were not ruled upon from June until December 16, 2014, a period of six months. If Appellees wanted a ruling on their objections they had ample opportunity to request a ruling before the appellate time table expired. This is a record of intentional neglect in seeking a ruling.

Under Texas Rule of Appellate Procedure 33.1 (a) (2) (A), rulings on objections to evidence may be express or implicit. For an implicit ruling, there must be some indication in the record that the trial court sustained or overruled the objections, other than the mere granting of the summary judgment. Parkway Dental Associates, P.A. v. Ho and Huang Properties, L.P., 391 S.W.3d 596, 603-04 (Tex. App.-Houston [14th Dist.] 2012, no pet.); See also SSP Partners v. Gladstrong Investments (USA) Corporation, 169 S.W.3d 27, 34 (Tex. App.-Corpus

Christi-Edinburg 2005, pet. granted) ("A "Mother Hubbard" clause in a summary judgment is of no import to show the court implicitly ruled on objections."); Well Solutions, Inc. v. Stafford, 32 S.W.3d 313, 317 (Tex. App.-San Antonio, 2000, no pet.) ("A Mother Hubbard clause operates on claims, not objections to summary judgment evidence.") In this case, the trial court's October 2 Order Granting Appellees' Motion for Summary Judgment does not specifically address the Appellees' objections by anything more than a Mother Hubbard clause. C.R. at 196. On December 10, 2014 the trial court couldn't remember why she granted the October 2, 2014-summary judgment. R.R. at 4.

Objections to the form of summary judgment evidence require a ruling in the trial court for error preservation. These types of objections include authentication, lack of foundation, or lack of personal knowledge, and hearsay objections. Tex. R. Civ. P. 166a (f); Dolcefino v. Kelley; 19 S.W.3d 906, 925 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).

The Appellees, in their first set of objections on May 29th, objected to the affidavit of Mr. Surrency on the grounds that the affidavit lacked foundation, that it was speculative, hearsay, conclusory, and not the best evidence. C.R. at 74-77. All other items of Appellant's evidence were objected to on the grounds of lack of authentication, lack of foundation, and hearsay. C.R. at 77. In their second set of objections, on June 16, Appellees objected to the second affidavit of Mr. Surrency

on the grounds of lack of a proper foundation and hearsay, and to Appellant's Exhibits on the basis of lack of authentication and hearsay. C.R. at 175. Therefore, all objections except those maintaining that the first affidavit of Mr. Surrency was speculative, conclusory, and that it violated the best evidence rule, were waived by the trial court's October 2 Order Granting Appellees' Motion for Summary Judgment.

>**B.** **Appellees' two December Motions to Modify Judgment, and for a Ruling on Objections, and 29 and 31 December letters requesting that the trial court vacate its 2 October final judgment and issue a new summary judgment were untimely.**

The appellate timetable runs from the signing date of whatever order that makes a judgment final and appealable. *Farmer v Ben E. Keith Co.*, 907 S.W.2d 495 (Tex. 1995). Since the Appellant filed a motion for new trial the trial court's plenary power was extended until December 16, 2014. Plenary power is defined as the court's power to dispose of any matter "properly before it." *Esty v. Beal Bank S.S.B*, 298 S.W.3d 287, 295 (Tex. App.-Dallas 2009, no pet.), citing *WMC Mort. Corp. v. Starkey*, 200 S.W.3d 749, 751 (Tex. App.-Dallas 2006, pet. denied).

>**1.** **Appellees' December 3rd Motion to Modify Judgment is governed by Texas Rule of Civil Procedure 329b; L.M. Healthcare, Inc. v. Childs, 929 S.W.2d 442 (Tex. 1996).**

Appellees had thirty days, from October 2, 2014, to file their motion to modify the judgment. Appellees filed their motion to modify long after the 30 day time limit expired. Thus, it was not "properly" before the trial court for a ruling.

**2.  Appellees' December 29 and 31, 2014-letters requesting the trial court to vacate and render a new judgment were not proper/timely made due to Texas Rule of Civil Procedure 329b; L.M. Healthcare, Inc. v. Childs, 929 S.W.2d 442 (Tex. 1996).**

After the Appellees obtained their requested relief on December 16, 2014 they were still not satisfied. They went back to the judge again, this time worried about Appellant's proposed argument on appeal. Appellant would argue that Appellees are not special people who do not have to abide by the rules of civil procedure regarding appellate deadlines.

Under Rule 329b (a) of the Texas Rules of Civil Procedure, "a motion for new trial … shall be filed prior to or within thirty days after the judgment or other order complained of is signed." Further, section (g) provides that "a motion to modify, correct, or reform a judgment … shall be filed and determined within the time prescribed by this rule for a motion for new trial …." In this case, the Appellees Motion to Modify Judgment, filed on December 3 (1 Suppl. at 4) and their two letters requesting that the trial court vacate its October 2, 2014-summary judgment, filed on January 6 (2 Suppl. at 8, 14), were unquestionably untimely.

16

**3.** **The trial court's December Ruling on the Appellees' objections was untimely because it was issued more than two months after the first summary judgment.**

> … the better practice is for the trial court to disclose, in writing, its rulings on all objections to summary judgment evidence at or before the time it enters the order granting or denying summary judgment. …. In any context, however, it is incumbent upon the party asserting objections to obtain a written ruling at, before, or very near the time the trial court rules on the motion for summary judgment or risk waiver.

Dolcefino v. Randolph, 19 S.W.3d 906, 926 (Tex. App.-Houston [14th Dist.] 2000, pet. denied) (emphasis added); Cf, Eaton Metal Products v. U.S. Denro Steels, No. 14-09-00757-CV (Tex. App.-Houston [14th Dist.] 2010, n.w.h.) (mem. op., not designated for publication), (rulings on evidentiary objections, issued a month after summary judgment, upheld because the trial court judge had read the motion for summary judgment and taken objections into consideration in his decision, and was merely "memorializing what the court thought"); Cf. Esty v. Beal Bank S.S.B., 298 S.W.3d 280, 295 (Tex. App.-Dallas 2009, no pet.) (The court was troubled by the timing of the order sustaining objections two months after judgment, but the parties had agreed to consider objections later.); Cf. Wolfe v. Devon Energy Production Company, 382 S.W.3d 434, 448 (Tex. App.-Waco 2012, pet. filed) (upholding a ruling on objections to summary judgment evidence a month after the final judgment because the objections were in a separate motion to strike).

On October 2, 2014 either the trial court denied the Appellees' objections with the Mother Hubbard clause or it did not.[4] It doesn't matter because the trial court ruled twice on those objections at later dates. In the present case, the Appellees failed to file a separate motion to strike evidence, there was no agreement to decide objections at a later time, and there was no indication that the court considered the objections in entering the October 2, 2014 judgment. To the contrary, Judge Storey said it was too late. (R.R. at 3). The trial court had plenary power until December 16, 2014. There is no indication which of the two December 2014 motions the trial court considered, or that it determined the Appellees' objections in its December 16, 2014 Ruling on Appellees' Objections to Appellant's Summary Judgment Evidence (1 Suppl. at 13). The December 16th ruling does not recite which motion came on to be heard or was granted.

On December 10, 2014, Judge Storey said that "it's a little late for objections, isn't it?" (R.R. at 3), "I don't remember the facts of this", and "I am not going to go back and check all these little boxes you gave me until I go back and look at it carefully and decide whether I did it because it was lack of foundation, speculative, hearsay, conclusory or best evidence (R.R. at 4). Because I just don't remember. So, I have to go back and look at it again." Id. The trial court asked

---

[4] Unquestionably, Appellees' counsel was concerned that the Mother Hubbard clause on October 2, 2014 created a flip-flop problem with the December 16, 2014 order. Such was the cause behind the December 29th and 31st letters.

when the Motion to Modify was filed. R.R. at 5. Then Judge Storey said "Last week. R.R. at 8. Well, I can't make all the substantive changes to it. Id. That's way beyond clerical." Id. Appellee then tendered a specific order on objections to Judge Storey.

If the trial court does not make specific rulings on evidence then the judgment can be affirmed if any one of the objections is valid. Hogan v. J. Higgins Trucking, Inc., 197 S.W.3d 879 (Tex. App. Dallas 2006, no pet.). In this case, however, given the opportunity to make specific rulings on objections, Judge Storey pondered the matter for six days and then refused. Refusing to make specific rulings coupled with a refusal to disclose which motion she was granting hides her analysis thus making Appellant and this court do extra work of reviewing every objection. Judge Storey knew substantive changes to the judgment could not be made per Hernandez v. Lopez, 288 S.W.3d 180, 184-85 (Tex. App.–Houston [1st Dist.] 2009, no pet.) (describing the differences between "judicial" and "clerical' errors in a judgment). For these reasons this court should reject Judge Storey's vague and global rulings on summary judgment evidence as being no rulings at all.

> **4.      Appellees' Motion for Ruling on Appellees' Objections to Appellant's Summary Judgment Evidence, filed on December 3, was an untimely request for Conclusions of Law per Texas Rule of Civil Procedure 296.**

Texas Rule of Civil Procedure 296 states that "in any case tried in the …
county court without a jury, any party may request the court to state in writing its
findings of fact and conclusions of law." Further, "such request … shall be filed
within twenty days after judgment is signed." Appellees' Motion for a Ruling on
Objections to Appellant's Summary Judgment Evidence (1 Suppl. at 6), which can
be considered as a request for conclusions of law, was filed on December 3, far
more than 20 days after the court's October 2 Order Granting Defendants' Motion
for Summary Judgment (C.R. at 196). Appellees did not ask for findings of fact so
rulings on objections must, by default, be conclusions of law.

**C.    The trial court's December 16 Ruling on Objections to
Appellant's Summary Judgment Evidence and January 6
Order Granting Appellees' Motion for Summary Judgment
and Final Judgment were an abuse of discretion.**

The admission and exclusion of evidence is committed to the trial court's
discretion. City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex. 1995).
A trial court abuses its discretion when it acts without regard for any guiding rules
or principles. An abuse of discretion is also established when the court acts in an
"unreasonable or arbitrary manner." Beaumont Bank, N.A. v. Buller, 806 S.W.2d
223, 226 (Tex. 1991).

In the present case, with its December 16 Ruling on Appellees' Objections
to Appellant's Summary Judgment Evidence (1 Suppl. at 13), and January 6 Order
Granting Appellees' Motion for Summary Judgment and Final Judgment (2 Suppl.

at 19), which were issued solely to exclude the Appellant's evidence, the trial court acted "without regard for any guiding rules or principles," or in an "unreasonable or arbitrary manner".

### D. The Appellees' Objections are not valid.

#### 1. Objections to Appellant's Motion for Summary Judgment evidence are not valid.

##### a. May 7 Affidavit of Mr. Surrency

The Appellees objected to the affidavit of Mr. Surrency (C.R. at 26) on the ground that "it lacks any foundation showing how the affiant has any personal knowledge of contract negotiations between strangers." (C.R. at 74). The parties were not strangers. Mr. Surrency was the listing real estate agent for the Appellees. He testified, in his affidavit attached to the Appellant's Motion for Summary Judgment, that he executed a listing agreement with the Appellees (C.R. at 15, 26, 33), and represented them as a party to the lease agreement with Mr. Nichols. C.R. at 15, 26. That lease agreement contained the option to purchase which triggered payment of Appellant's earned commission. C.R. at 43, 58. The Appellant's Exhibits, including the letter to Mr. and Mrs. Huerta from Mr. Nichols' attorney (C.R. at 61), and Mr. Nichols' check tendered as earnest money (C.R. at 62) support Mr. Surrency's statements.

In particular, Appellees objected to the following:

The statement that "I hereby swear that all statements of fact in Paragraph 1 of the Motion for Summary Judgment are all true and correct"; in particular, the statement in Paragraph 1 of the Motion that "The [Appellees] … have failed and refused to sell the property to Mr. Nichols." C.R. at 74. This statement is not hearsay because it does not involve an out of court statement. See, Tex. R. Evid. 801 (d). Further, this statement is not speculative or conclusory because the affidavit provides supporting facts that Mr. Surrency obtained in the course of his business.

The statement that "[Mr. Nichols] told me that he had sent the [Appellees] notice of his intent to exercise the purchase option, through his attorney, and that he later sent them a check in the amount of $1,000.00 as earnest money …." (C.R. at 76, 77) is not hearsay because it is never offered for the truth of the matter asserted, but to explain the circumstances surrounding Mr. Nichols' exercise of the purchase option, and his tender of a check as earnest money, both of which are independently proven by documentary evidence. Mr. Nichols' check noted on its face that it was tendered as earnest money. C.R. at 62. When Ms. Huerta endorsed the check she agreed to the term of tender as a matter of law[5], Trevino v. Brookhill Capital Resources, Inc., 782 S.W.2d 279, 281 (Tex. App.-Houston [1st Dist.] 1989,

_____

[5] If she did not agree to the terms of tender, her only option was to return the check to Mr. Nichols. Trevino v. Brookhill Capital Resources, Inc., 782 S.W.2d 279 (Tex. App.-Houston [1st Dist.] 1989, writ denied).

writ denied), and the check became her admission of a party opponent. Tex. R. Evid. 801 (e) (2). The endorsement by Ms. Huerta is not disputed by Appellees; they simply argued that she could disregard the terms of tender and apply the funds towards rent. C.R. at 81. Thus, by her own affidavit, Ms. Huerta created a fact question as to her refusal to sell the property to Mr. Nichols. Mrs. Huerta also admitted to the letter sent by Mr. Nichols' attorney.[6]

The statement that "I hereby swear that all statements of fact in Paragraph 1 of the Motion for Summary Judgment are all true and correct"; in particular, the statement in Paragraph 1 of the Motion that "On or about November 30, 2011, Plaintiff and the Defendants made a written contract in Houston, Texas, styled as "Commercial Real Estate Listing Agreement" (C.R. at 15, 26). This statement is not offered to prove the existence or contents of the contract, but is explanatory of associated circumstances. Besides, neither party disputed the two contracts in question: the listing agreement and the lease agreement. Both contracts are attached to Mrs. Huerta's May 28, 2014 affidavit. C.R. at 81. It is the Appellees' contention that the Appellant's commission was earned but not payable per the contracts.

---

[6] The lease agreement, which was attached to Ms. Huerta's affidavit, stated on page 13 of 15, "Notices" were to be sent to 3215 Broadway, Hou. Tx. 77017. The Appellees never agreed to actually needing to receive the notice to be bound to sell the property. Notice should be made that both Mr. and Mrs. Huerta initialed page 13 of 15 about an inch below where the "Notice" provision is set forth. If the Appellees wanted to correct this provision, then they could do so per Paragraph 36(a). Such a correction was never made.

### b. Letter to Mr. and Mrs. Huerta from Mr. Nichols' attorney

Mrs. Huerta admits to knowing about the letter in her May 28, 2014 affidavit. C.R. at 82. She also had actual knowledge of Mr. Nichols' intent to buy the property. C.R. at 81, 82. The lease agreement stated that the Appellees agreed that Nichols' notice was to be sent to the address listed in Paragraph 34, not that the Appellees had to receive that notice. C.R. at 54. Thus, the argument that they did not receive the notice is false per their own agreement. And their argument that Appellant made a mistake in drafting the lease is also false; the Appellees initialed the lease below Paragraph 34, and any alleged drafting error was barred by the parol evidence rule.

### c. Mr. Nichols' check sent as earnest money

These were authenticated as business records in Mr. Surrency's affidavit, under Texas Rule of Evidence 803 (6). C.R. at 26, 27. See GT & MC, Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 257-58 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (business records can be by adoption). If Mr. Surrency wanted to get paid his commission, then it certainly was his business to watch what Mr. Nichols and the Appellees were doing in regard to the lease agreement. Additionally, Mr. Nichols' check, with the endorsement of Ms. Huerta, is an admission by party-opponent under Texas Rule of Evidence 801 (e) (2).

Also, any objection to the check was waived by Mrs. Huerta's May 28, 2014 affidavit where she discusses receiving the check, negotiating the check and applying it to rent. C.R. at 82.

**2.     Objections to Appellant's Reply to Appellees' Cross-Motion for Summary Judgment evidence are not valid.**

**a.     June 6 Affidavit of Mr. Surrency**

The Appellees objected to certain statements in the second Affidavit of Mr. Surrency (C.R. at 141) on the ground that they were hearsay and lacked a proper foundation. C.R. at 175. The objections did not specify how the statements lacked foundation, and are, therefore, general objections that do not preserve error, Tex. R. Evid. 103 (a) (1); Petroleum Analyzer Company v. Olstowski, 01-09-00076-CV (Tex. App.-Houston [1st Dist.] 2010, n.w.h.) (mem. op., not designated for publication); Seymour v. Gillespie, 608 S.W.2d 897, 898 (Tex. 1980). In particular, the appellants objected to the following:

The first three sentences of Paragraph 1:

> On or about June 15 2013 I learned that Mr. Richard Nichols wanted to exercise his option to purchase the property he leased from Mr. and Mrs. Huerta. I told Mr. Nichols that he needed to send the Huertas a certified letter stating that. Mr. Nichols wanted me to draft that letter for him.

Mr. Surrency's first sentence is not hearsay because it does not mention what Mr. Nichols said. It's what he learned. The second sentence is what Mr. Surrency did:

he told Mr. Nichols something. Such a statement is not hearsay because it was not offered for the truth of the matter asserted, but to explain what happened in regard to Mr. Nichols' exercise of his option to purchase. The third sentence is what Mr. Nichols asked Mr. Surrency to do, not referencing any statement, and not offered for the truth of the matter asserted.

All of Paragraph 2:

> Next, I learned that the Huertas would sell the property to Mr. Nichols, but on one condition. If Mr. Nichols went through me, then Mr. Nichols would have problems with Ms. Huerta because she was not going to pay my sale's commission. I understand Ms. Huerta told Mr. Nichols to withdraw his exercise of the option to purchase, and she would sell the property to him. I learned that Mr. Nichols did not use the letter I drafted for him. He went to an attorney who drafted a letter to Ms. Huerta with a closing date at a title company. See Exhibit 2, attached hereto. The letter, Exhibit 2, was addressed to the exact address the Huertas agreed that the notice was to be sent to in the lease agreement. I understand that Ms. Huerta did not show up for closing and refused to provide an alternative closing date.

None of these statements discuss what was said. Mr. Surrency learned and understood things, and thus not testimony of out of court statements. They are not hearsay because they are not offered for the truth of the matter asserted, but to explain and develop the circumstances associated with Mr. Nichols' exercise of the purchase option. On the other hand, if they are seen to be statements, then Tex. R. Evid. 801 (e) (2) (D) applies. Mrs. Huerta admitted in her May 28, 2014-affidavit that Appellant was her agent. C.R. at 81. As Appellees' listing real estate agent,

Mr. Surrency was acting within the scope of his agency or employment made during the existence of the relationship.

### b. Letter to Mr. and Mrs. Huerta from Mr. Nichols' attorney

The Appellees objected to the letter sent to Mr. and Mrs. Huerta by Richard Nichols' attorney on the grounds of hearsay and lack of a proper foundation. C.R. at 175. This letter is a business record kept by Appellant. C.R. at 26, 27. See GT & MC, Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 257-58 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (business record by adoption; Appellant's primary record of information about the underlying transaction). Additionally, Mrs. Huerta's May 28, 2014-affidavit admits to actual knowledge of Nichols' intent to exercise the option as well as the letter from the attorney. C.R. at 81-82. Thus, the Appellees waived their objection.

### c. Mr. Nichols' check sent as earnest money

The Appellees also objected to Mr. Nichols' check sent as earnest money on the basis of hearsay and lack of a proper foundation. C.R. 175. These were authenticated as business records in Mr. Surrency's affidavit, under Texas Rule of Evidence 803 (6) (C.R. at 26, 27); GT & MC, Inc. v. Texas City Ref., Inc., 822 S.W.2d 252, 257-58 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (business record by adoption; Appellant's primary record of information about the underlying transaction). Also, when Mrs. Huerta endorsed the check, it became

27

her statement and was admissible as an admission. Tex. R. Evid. 801(e) (2).  Ms.

Huerta also testified to the check in her May 28, 2014-affidavit. C.R. at 82. Thus,

the objection was waived.

**POINT OF ERROR II: THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES.**

**A.      Summary judgment standard of review**

In Valence Operating Company v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005), the

Texas Supreme Court stated:

> We review the trial court's summary judgment de novo. When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. When both parties move for … summary judgment on the same issues and the trial court grants one motion and denies the other, … the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered.

Review of a no-evidence summary judgment is a little different than a traditional

motion for summary judgment:

> In reviewing a no-evidence summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in the no-evidence motion. In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. When the order granting summary judgment does not specify the grounds upon

which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious.

Parkway Dental Associates, P.A. v. Ho & Huang Properties, L.P., 391 S.W.3d 596, 602 (Tex. App.-Houston [14th Dist.] 2012, no pet.).

In their Cross-Motion for Summary Judgment, the Appellees asserted (C.R. at 69):

> Plaintiff has no evidence of one of the essential elements of its claim-that Defendants breached the contract. …. Payment has never become due because sale of the property has not closed, and Defendants have never refused to sell the property. Additionally Plaintiff has no evidence that a contract existed between Plaintiff and Defendant, Roel Huerta.[7]

To make this assertion, the Appellees have to rely upon or prove the actual terms of the lease. So, Mrs. Huerta proved-up the two leases as exhibits 1 and 2 to her May 28, 2014-affidavit. (C.R. at 81-83). It is in the lease where the terms of when the Appellant's earned commission gets paid. When making their no evidence motion, the Appellees actually produced more evidence in the form of Mrs. Huerta's affidavit and another affidavit. The statements in Mrs. Huerta's affidavit created a fact issue about her refusal to sell the property to Mr. Nichols because she accepted his earnest money check (thus establishing, as a matter of law, her knowledge of his desire to buy), did not sell to Mr. Nichols and took the money as rent. C.R. at 82. She admits to knowing about the exercise of the option by Mr.

---

[7] Mrs. Huerta testified, in her May 28, 2014 affidavit, that she and her husband entered into the listing agreement with the Appellant. This contradicts the no evidence motion for summary judgment Appellees filed.

Nichols in July 2013, but not selling the property before July 31, 2014. Id. Counsel for the Appellees notified the trial court in his December 29, and 31, 2014-letters that the property still has not sold: a year and a half after Nichols gave his notice. 2 Suppl. at 8, 14. Appellees responded to the issue of Mr. Nichols' earnest money check with an unsupported claim that Mrs. Huerta could unilaterally do as she pleased with Mr. Nichols' money. Additionally, Ms. Huerta's story about "renegotiating" the terms of sale to Mr. Nichols is not an excuse for not selling to Mr. Nichols under the terms of the lease. Determining any duty to renegotiate is a question of law, and since there is no such duty, the "renegotiating" excuse is a red herring.

### B.    If Appellees' objections to evidence are determined to be invalid, then there is controverting evidence.

On December 3, 2014 Appellees' counsel told the trial court that the October 2, 2014-summary judgment could not stand because of Appellant's controverting evidence. 1 Suppl. at 4, 6. On December 10, 2014, during a recorded oral hearing, counsel for Appellees again made the same statement. R.R. at 3. As already stated, Mrs. Huerta's May 28, 2014-affidavit admits to virtually everything her counsel wanted to exclude by objection. C.R. at 81. Thus, the objections were waived. Nevertheless, an affidavit from an interested witness must be "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies…" Tex. R. Civ. P. 166a ( c); Huckabee v. Time Warner Entertainment Co., L.P., 19 S.W.3d

30

413 (Tex. 2000). When Mrs. Huerta tries to claim she did not get the attorney's letter that is a negative fact. C.R. at 81. It also contradicts the fact that she admits to having actual knowledge of Mr. Nichols desire to exercise his option to purchase. C.R. at 82. That is a contradiction. Mrs. Huerta admits to the entire lease, with its time of the essence clause (page 15 of 15, Paragraph I) (C.R. at 81), then admits to not selling the property for more than that a year after Nichols attorney gave notice to the contract she agreed to. C.R. at 82. That is another contradiction. Then there is the contradiction between accepting Mr. Nichols' earnest money check, and Ms. Huerta's story about "renegotiating" the terms of the sale.

**C.    If Appellees' objections are determined to be valid, then Appellees' summary judgment evidence created material issues of fact.**

As previously discussed, Mrs. Huerta's May 28, 2014-affidavit provides proof which contradicts her claim that the Appellant's commission is not payable. C.R. at 81. She proves the lease and its contents. She proves notice of option by Mr. Nichols. She proves the sale of the property was never made for more than a year even though she had duty to sell in a "time of the essence" manner. Then there is the fact issue presented by Mrs. Huerta's conduct of cashing Mr. Nichols' earnest money check, and then making the self-serving assertion that Mr. Nichols was trying to renegotiate the terms of the sale.

**POINT OF ERROR III: THE TRIAL COURT ERRED BY DENYING THE APPELLANT DUE PROCESS.**

    **A.    Due process requirements requires meaningful notice, a fair trial, and a fair and impartial judge.**

In Peralta v. Heights Medical Center, Inc., 485 U.S. 80, 84 (1988), the U.S. Supreme Court stated that "an elemental and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to preserve their objections." The Supreme Court goes on to state that the remedy for a deprivation of due process is to "restore[ ] the [party] to the position he would have occupied had due process of law been accorded to him in the first place", rather than to determine whether or not his claim is meritorious. Id. at 87.

In the case In re J.F.C., 96 S.W.3d 256, 300 (Tex. 2002), (Schneider, J., dissenting), from the Texas Supreme Court case, it was written that "we have emphasized time and again that "the touchstone of due process is protection of the individual against arbitrary action of government"", citing Wolff v. McDonnell, 418 U.S. 539 (1974). These concepts are developed in Metzger v. Sebek, 892 S.W.2d 20, 37-8 (Tex. App.-Houston [1st Dist.] 1994, no pet.). That court wrote:

> The parties have a right to a fair trial under both the United States Constitution and the Texas Constitution. …. A judge should be fair and impartial and not act as an advocate for any party. … Public policy demands

that a judge who tries a case act with absolute impartiality. It further demands that a judge appear to be impartial so that no doubts or suspicions exist as to the fairness or the integrity of the court. Judicial decisions rendered under circumstances that suggest bias, prejudice or favoritism undermine the integrity of the courts, breed skepticism and mistrust, and thwart the principles on which the judicial system is based.

### B. The Court considered two requests from the Appellees that were letters, not motions.

In this case, the trial court erred by denying the Appellant due process when it did the following:

1. Entered the January 6, 2015 judgment (2 Suppl. at 18) pursuant to Appellees' counsel's December 29, 2014 and December 31, 2014-letters (2 Suppl. At 8, 14) because those letters were not e-filed;

2. Entered the January 6, 2015-judgment before the Appellant had a reasonable opportunity to be heard;

3. Considered relief that Appellees had no right to request under Texas Rules of Civil Procedure 296 and 329b;

4. Maintained two separate and distinct electronic docket sheets (3 Suppl. at 6, 23, 30);

5. Backdated one electronic docket sheet to show that Appellant's e-filed letter response of January 6, 2015 was before the court as of 2:55 pm, six hours before that letter was e-filed (3 Suppl. at 19);

6. Acted as an advocate to defeat Appellant's proposed appellate argument as the reason to enter the January 6, 2015 judgment; and

7. Created a record clearly establishing that the trial court was not an impartial judge in this case.

The central meaning of the due process clause of the U.S. Constitution has been clear: "Parties whose rights are to be affected are entitled to be heard; in order

to that they may enjoy that right, they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 80 (1972). For the right to notice and a hearing is to serve its full purpose opportunity for the hearing must be provided when a deprivation can be prevented. A fair, impartial judge is also included in the term due process. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988) n. 12. See also Tumey v. Ohio, 273 U.S. 510 (1927); In re Murchison, 349 U.S. 133 (1955); Ward v. Village of Monroeville, 409 U.S. 57 (1972); Texas Code of Judicial Conduct, Canon 3 (B) (8). Both prongs of due process issues have been violated here.

On January 6, 2015 the trial court most likely entered its judgment of that date between 11:15 am [file stamp on page 3 of judgment] (2 Suppl. at 20) and 4:06 pm [page 14 of 17 of the docket sheet with times noted] (3 Suppl. at 19). Appellant did not file its letter response until 8:57 pm that day. 2 Suppl. at 16. The difference between the trial court's noted time of 2:55 pm [Page 14 of 17 of timed docket sheet] (3 Suppl. at 19) and the e-file stamp of 8:57 was six hours and two minutes. Most likely judge Storey did not see Appellant's January 6-letter at 8:57 on the night of January 6, but rather saw it on the morning of January 7, 2015. There is no innocent reason why the "timed" docket sheet was backdated. There is no innocent reason there are two docket sheets; one with times, and the other

without time notations when a document or issues contained therein was before the trial court. The only explanation for the back-dated docket sheet is so that Judge Storey could defend herself against a claim of being ex-parte'd by the Appellees' two late December letters.

As of January 1, 2014 all civil cases handled by an attorney must be e-filed. Appellee's counsel dispensed with that requirement on both December 29 and 31, 2014-letters. There is no excuse for this. Counsel should have filed a motion with a certificate of conference and requested either a hearing or a submission date. He has no excuse for not doing this. The trial court, as the judge of the law, must have known that Appellee's counsel did not e-file his request or follow the rules of procedure. Yet, she granted his requested relief, noted that Appellant's e-filed response was before the court six hours before it was filed and maintained two different docket sheets.[8] When the Clerk's record was first prepared, the docket sheet without the time notations was included in the record. 3 Suppl. at 30. Appellant had to specifically request a supplemental record to show the court's unexplainable two sets of "books."

---

[8] Please note that it was the Appellant who requested the supplemental clerks' record include the docket sheet with the judge's notations of times. The first docket sheet filed with the clerk's record on appeal did not have those times noted, and it was pure luck that the Appellant noticed this "two sets of books" problem.

In Appellees' counsel's two late December letters he requested much more that his earlier motions. He asked for a change of party's names by incorrectly labeling the mistake as a "typo." 2 Suppl. At 8, 14. Hernandez v. Lopez, 288 S.W.3d 180, 184-85 (Tex. App.–Houston [1st Dist.] 2009, no pet.). Since the time to move to modify a judgment had expired 30 days after the October 2, 2014-judgment, counsel had no right to request that relief. The issue of modification was not "properly before the court."

This appellate court is in the best position to sculpt a remedy for Judge Storey's lack of impartiality. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988). The remedy for a deprivation of due process is to "restore[ ] the [party] to the position he would have occupied had due process of law been accorded to him in the first place," rather than to determine whether or not his claim is meritorious. Peralta v. Heights Medical Center, Inc., 485 U.S. 80, 87 (1988).

There is no need to send Appellant back to the trial court to file and prosecute a motion to recuse judge Storey and present the evidence of highly improper conduct currently before this court. Per the reasonable person test of Rogers v. Bradley, 909 S.W.2d 872 (Tex. 1995)[9] a reasonable, disinterested person

[9] The standard is an objective one. In Rogers v. Bradley, 909 S.W.2d 872 (Tex. 1995) the Texas Supreme Court adopted the Liljeberg v. Health Services Corp., 486 U.S. (1988) standard.

would find Judge Storey's behavior outside the Canons of Judicial Ethics and partial to the Appellees' desire to win on appeal. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 487 (1988) (adopting the reasonable person test for determining the impartiality of a judge); Cf, Norton v. State, 755 S.W.2d 522 (Tex. App.-Houston [1st Dist.] 1988, writ ref'd); Mason v. State, 771 S.W.2d 561 (Tex. Cr. App. 1989, no writ) (recusal for remarks on the bench displaying prejudice); Cf, Rosas v. State, 76 S.W.3d (Tex. App.-Houston [1st Dist.] 2002, no writ) (reasonable person would harbor doubts as to judge's impartiality). Duplicating the evidence in a recusal hearing would lead to the unnecessary discredit of a sitting judge. Judicial economy demands that a mandate be issued requiring Judge Storey recuse herself from this matter.

## PRAYER

**WHEREFORE**, Appellant respectfully requests that the judgment of the trial court be reversed, and that this case be remanded for further proceedings; further that the court issue a mandate commanding that Judge Storey recuse herself from retrial of this cause and request that the Presiding Judge of the Administrative Judicial District assign another Judge to sit in this case.

Respectfully submitted,

/s/ James L. Supkis
James L. Supkis, Attorney for Appellant San
Sebastian Realty Co., Inc.
Texas Bar No. 19516800

P.O. Box 58243
Houston, TX 77258
Tel. (281) 723-9964
Fax. (713) 645-9138

## CERTIFICATE OF COMPLIANCE

I certify that, according to Microsoft Word's word counting function, the portion of this brief for which Texas Rule of Appellate Procedure 9.4 (i) (3) requires a word count contains 8,449 words.

/s/ James L. Supkis
James L. Supkis, Attorney for Appellant San Sebastian Realty Co., Inc.

## CERTIFICATE OF SERVICE

This is to certify that on 19 February 2015 a true and correct copy of the above and foregoing Brief for Appellant was served on Mark E. Lewis, Attorney for the Appellees Roel Huerta, and Rosa M. Huerta, by regular U.S. mail, certified, and with return-receipt requested, at 3730 Kirby Drive, Suite 1030, Houston, TX 77098.

/s/ James L. Supkis
James L. Supkis, Attorney for Appellant San Sebastian Realty Co., Inc.

## APPENDIX

1. Trial Court's Order Granting Defendants' Motion for Summary Judgment, signed on October 2, 2014

2. Trial Court's Ruling on Defendants' Objections to Plaintiff's Summary Judgment Evidence, signed on December 16, 2014

3. Trial Court's Order Granting Defendants' Motion for Summary Judgment and Final Judgment, signed on January 6, 2015

4. Texas Code of Judicial Conduct, Preamble through Canon 3

5. Commercial Real Estate Listing Agreement

6. Commercial Lease

**"CLOSED"**

**EXHIBIT**

1

**CAUSE NO. 1043170**

| | | |
|---|---|---|
| **SAN SEBASTIAN REALTY CO., INC.** | § § § | **COUNTY COURT AT LAW** |
| | § | **NO. 3** |
| **v.** | § § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **ROEL HUERTA and ROSA M. HUERTA** | § § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On _____Oct 2_____, 2014, the court considered Defendants' Motion for Summary Judgment regarding the claims of Plaintiff, San Sebastian Realty Co., Inc. and regarding Defendants' counterclaim for attorney's fees and costs.

After due consideration of the summary judgment evidence, the pleadings, and the argument of counsel, if any, this Court finds that Plaintiff's motion is due to be GRANTED.

It is therefore ORDERED that Defendants' motion for summary judgment is GRANTED in its entirety and makes the following findings:

There is no genuine issue material fact on Plaintiff's breach of contract claims against Defendants, and Defendants are entitled to summary judgment on all of Plaintiff's claims.

The contract giving rise to this dispute provides that the prevailing party in any dispute shall recover its reasonable attorney's fees and costs. As the prevailing parties, Defendants are entitled to recovery on their counterclaim for such fees and costs.

IT IS THEREFORE ORDERED that judgment is entered in favor of Defendants and against Plaintiff on all of Plaintiff's claims and that Plaintiff take nothing by virtue of this suit.

IT IS FURTHER ORDERED that Defendants recover judgment against Plaintiff in the amount of $3,228.30 as reasonable attorney's fees and costs for the benefit of Mark E. Lewis. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that should Plaintiff fail to pay the judgment rendered above, and Defendant be required to conduct post-judgment discovery and enforce the judgment, Defendants recover judgment against Plaintiff in the amount of $2,000.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in conducting post-judgment discovery and enforcing the judgment. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT FURTHER ORDERED that should the Plaintiff file an unsuccessful Motion for New Trial, Defendants shall recover judgment against Plaintiff in the amount of $900.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in responding to Plaintiff's unsuccessful motion. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

UNOFFICIAL COPY

IT IS FURTHER ORDERED that should Plaintiff unsuccessfully appeal this cause of action to an intermediate court, Defendants shall recover judgment against Plaintiff in the amount of $5,000.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in responding to Plaintiff's unsuccessful appeal. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that should Plaintiff unsuccessfully appeal this cause to the Texas Supreme Court, Defendants shall recover judgment against Plaintiff in the amount of $3,000.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in responding to Plaintiff's unsuccessful appeal. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that Plaintiff is entitled to enforce this judgment through abstract, execution, and any other lawful practice or procedure.

All relief requested and not expressly granted is denied.

Signed this 2 day of Oct, 2014.

_____
JUDGE PRESIDING

UNOFFICIAL COPY

FILED
2014 JUN 19 PM 1:55
COUNTY CLERK
HARRIS COUNTY, TEXAS

FILED
2014 OCT -2 PM 12:03

**RECORDER'S MEMORANDUM:**
At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blockouts, additions and changes were present at the time the instrument was filed and recorded.

EXHIBIT

2

CAUSE NO. 1043170

| | | |
|---|---|---|
| SAN SEBASTIAN REALTY CO., INC. | § | COUNTY COURT AT LAW |
| | § | |
| | § | NO. 3 |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ROEL HUERTA and | § | |
| ROSA M. HUERTA | § | |

## RULING ON DEFENDANTS' OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

The Court SUSTAINS Defendants' objections to Plaintiff's summary judgment

evidence.

Signed this _____ day of DEC 1 6 2014 , 2014.

JUDGE PRESIDING



"CLOSED"

EXHIBIT

3

CAUSE NO. 1043170

| SAN SEBASTIAN REALTY CO., INC. | § | COUNTY COURT AT LAW |
| | § | |
| | § | NO. 3 |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ROEL HUERTA and | § | |
| ROSA M. HUERTA | § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND FINAL JUDGMENT

The Court hereby VACATES its Order and Judgment dated October 2, 2014 and enters the following Orders and Final Judgment.

Having considered Defendants' Motion for Summary Judgment regarding the claims of Plaintiff, San Sebastian Realty Co., Inc. and regarding Defendants' counterclaim for attorney's fees and costs.

After due consideration of the summary judgment evidence, the pleadings, and the argument of counsel, if any, this Court finds that Defendant's motion is due to be GRANTED.

It is therefore ORDERED that Defendants' motion for summary judgment is GRANTED in its entirety and makes the following findings:

There is no genuine issue material fact on Plaintiff's breach of contract claims against Defendants, and Defendants are entitled to summary judgment on all of Plaintiff's claims.

The contract giving rise to this dispute provides that the prevailing party in any dispute shall recover its reasonable attorney's fees and costs. As the prevailing

parties, Defendants are entitled to recovery on their counterclaim for such fees and costs.

IT IS THEREFORE ORDERED that judgment is entered in favor of Defendants, Rosa Huerta and Roel Huerta, and against Plaintiff, San Sebastian Realty Co., Inc., on all of Plaintiff's claims and that Plaintiff take nothing by virtue of this suit.

IT IS FURTHER ORDERED that Defendants, Rosa Huerta and Roel Huerta, recover judgment against Plaintiff, San Sebastian Realty Co., Inc., in the amount of $3,228.30 as reasonable attorney's fees and costs for the benefit of Mark E. Lewis. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that should Plaintiff unsuccessfully appeal this cause of action to an intermediate court, Defendants, Rosa Huerta and Roel Huerta, shall recover judgment against Plaintiff, San Sebastian Realty Co., Inc., in the amount of $5,000.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in responding to Plaintiff's unsuccessful appeal. Such judgment, for which execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that should Plaintiff unsuccessfully appeal this cause to the Texas Supreme Court, Defendants, Rosa Huerta and Roel Huerta, shall recover judgment against Plaintiff, San Sebastian Realty Co., Inc., in the amount of $3,000.00 for the benefit of Mark E. Lewis as reasonable attorney's fees and costs involved in responding to Plaintiff's unsuccessful appeal. Such judgment, for which

execution shall issue, shall bear interest at the rate of 5% per annum, compounded annually from the date of this judgment until paid.

IT IS FURTHER ORDERED that Defendants are entitled to enforce this judgment through abstract, execution, and any other lawful practice or procedure.

The Court SUSTAINS all of the objections to Plaintiff's summary judgment evidence made by Defendants.

All relief requested and not expressly granted is denied.

Signed this __6__ day of __Jan__, 2015.

_____
JUDGE PRESIDING

UNOFFICIAL COPY

**EXHIBIT**

___4___



# TEXAS CODE
# OF JUDICIAL CONDUCT

(As amended by the Supreme Court of Texas through August 22, 2002)

**Preamble**

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code of Judicial Conduct are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

The Code of Judicial Conduct is not intended as an exhaustive guide for the conduct of judges. They should also be governed in their judicial and personal conduct by general ethical standards. The Code is intended, however, to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

**Canon 1: Upholding the Integrity and Independence of the Judiciary**

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective.

**Canon 2: Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities**

A.  A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B.  A judge shall not allow any relationship to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

C.  A judge shall not knowingly hold membership in any organization that practices discrimination prohibited by law.

**Canon 3: Performing the Duties of Judicial Office Impartially and Diligently**

**A.     Judicial Duties in General.** The judicial duties of a judge take precedence over all the judge's other activities. Judicial duties include all the duties of the judge's office prescribed by law. In the performance of these duties, the following standards apply:

**B.     Adjudicative Responsibilities.**

(1)     A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate.

(2)     A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.

(3)     A judge shall require order and decorum in proceedings before the judge.

(4)     A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.

(5)     A judge shall perform judicial duties without bias or prejudice.

(6)     A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.

(7)     A judge shall require lawyers in proceedings before the court to refrain from manifesting, by words or conduct, bias or prejudice based on race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status against parties, witnesses, counsel or others. This requirement does not preclude legitimate advocacy when any of these factors is an issue in the proceeding.

(8)     A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding. A judge shall require compliance with this subsection by court personnel subject to the judge's direction and control. This subsection does not prohibit:

  (a) communications concerning uncontested administrative or uncontested procedural matters;

  (b) conferring separately with the parties and/or their lawyers in an effort to mediate or settle matters, provided, however, that the judge shall first give notice to all parties and not thereafter hear any contested matters between the parties except with the consent of all parties;

(c) obtaining the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond;

(d) consulting with other judges or with court personnel;

(e) considering an *ex parte* communication expressly authorized by law.

(9) A judge should dispose of all judicial matters promptly, efficiently and fairly.

(10) A judge shall abstain from public comment about a pending or impending proceeding which may come before the judge's court in a manner which suggests to a reasonable person the judge's probable decision on any particular case. This prohibition applies to any candidate for judicial office, with respect to judicial proceedings pending or impending in the court on which the candidate would serve if elected. A judge shall require similar abstention on the part of court personnel subject to the judge's direction and control. This section does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court. This section does not apply to proceedings in which the judge or judicial candidate is a litigant in a personal capacity.

(11) A judge shall not disclose or use, for any purpose unrelated to judicial duties, nonpublic information acquired in a judicial capacity. The discussions, votes, positions taken, and writings of appellate judges and court personnel about causes are confidences of the court and shall be revealed only through a court's judgment, a written opinion or in accordance with Supreme Court guidelines for a court approved history project.

## C. Administrative Responsibilities.

(1) A judge should diligently and promptly discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.

(2) A judge should require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.

(3) A judge with supervisory authority for the judicial performance of other judges should take reasonable measures to assure the prompt disposition of matters before them and the proper performance of their other judicial responsibilities.

(4) A judge shall not make unnecessary appointments. A judge shall exercise the power of appointment impartially and on the basis of merit. A judge shall avoid nepotism and favoritism. A judge shall not approve compensation of appointees beyond the fair value of services rendered.

(5) A judge shall not fail to comply with Rule 12 of the Rules of Judicial Administration, knowing that the failure to comply is in violation of the rule.

**D.    Disciplinary Responsibilities.**

(1)    A judge who receives information clearly establishing that another judge has committed a violation of this Code should take appropriate action. A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question as to the other judge's fitness for office shall inform the State Commission on Judicial Conduct or take other appropriate action.

(2)    A judge who receives information clearly establishing that a lawyer has committed a violation of the Texas Disciplinary Rules of Professional Conduct should take appropriate action. A judge having knowledge that a lawyer has committed a violation of the Texas Disciplinary Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the Office of the General Counsel of the State Bar of Texas or take other appropriate action.

**Canon 4: Conducting the Judge's Extra-Judicial Activities to Minimize the Risk of Conflict with Judicial Obligations**

**A.    Extra-Judicial Activities in General.** A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(1)    cast reasonable doubt on the judge's capacity to act impartially as a judge; or

(2)    interfere with the proper performance of judicial duties.

**B.    Activities to Improve the Law.** A judge may:

(1)    speak, write, lecture, teach and participate in extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code; and,

(2)    serve as a member, officer, or director of an organization or governmental agency devoted to the improvement of the law, the legal system, or the administration of justice. A judge may assist such an organization in raising funds and may participate in their management and investment, but should not personally participate in public fund raising activities. He or she may make recommendations to public and private fund-granting agencies on projects and programs concerning the law, the legal system and the administration of justice.

**C.    Civic or Charitable Activities.** A judge may participate in civic and charitable activities that do not reflect adversely upon the judge's impartiality or interfere with the performance of judicial duties. A judge may serve as an officer, director, trustee or non-legal advisor of an educational, religious, charitable, fraternal, or civic organization not conducted for the profit of its members, subject to the following limitations:

(1)    A judge should not serve if it is likely that the organization will be engaged in proceedings that would ordinarily come before the judge or will be regularly or frequently engaged in adversary proceedings in any court.

(2)    A judge shall not solicit funds for any educational, religious, charitable, fraternal or civic organization, but may be listed as an officer, director, delegate, or trustee of such an organization, and may be a speaker or a guest of honor at an organization's fund raising events.

EXHIBIT

5



### TEXAS ASSOCIATION OF REALTORS®
# COMMERCIAL REAL ESTATE LISTING AGREEMENT
# EXCLUSIVE RIGHT TO SELL

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

1. **PARTIES:** The parties to this agreement (this Listing) are:

Seller: ROEL and ROSA M. HUERTA

    Address: 3215 BROADWAY ST 1
    City, State, Zip: HOUSTON TEXAS 77017
    Phone: (713) 643-4452        Fax:
    E-Mail:

Broker: SAN SEBASTIAN REALTY CO. INC.
    Address: P.O. 751653
    City, State, Zip: HOUSTON, TX   77275
    Phone: 713 2990109        Fax:
    E-Mail:

Seller appoints Broker as Seller's sole and exclusive real estate agent and grants to Broker the exclusive right to sell the Property.

2. **PROPERTY:**

A. "Property" means the following real property in Texas:
    Address: 8304 PARK PLACE BLVD
    City: HOUSTON        County: HARRIS        Zip: 77017
    Legal Description (Identify exhibit if described on attachment): TR 2A BLK 18 PARK PLACE VILLA

B. Except as otherwise provided in this Listing, Broker is to market the Property together with:
(1) all buildings, improvements, and fixtures;
(2) all rights, privileges, and appurtenances pertaining to the Property, including Seller's right, title, and interest in any minerals, utilities, adjacent streets, alleys, strips, gores, easements and rights-of-way;
(3) Seller's interest in all leases, rents, and security deposits for all or part of the Property;
(4) Seller's interest in all licenses and permits related to the Property;
(5) Seller's interest in all third party warranties or guaranties, if transferable, relating to the Property or any fixtures;
(6) Seller's interest in any trade names, if transferable, used in connection with the Property; and
(7) all Seller's tangible personal property located on the Property that is used in connection with the Property's operations except: VENDING MACHINES

*(Describe any exceptions, reservations, or restrictions in Special Provisions or an addendum. If the Property is a condominium, attach Condominium Addendum to Listing (TAR-1401).)*

(TAR-1301) 1-26-10    Initialed for Identification by Seller R. H. and Broker/Associate    Page 1 of 9

San Sebastian Realty Inc. PO Box 751653 Houston, TX 77275
Phone: 132990109    Fax: 281.335.0633    Gene Surrency        Untitled
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

8304 PARK PLACE BLVD

Commercial Listing concerning HOUSTON,    77017             *R. H.*

## 3. LISTING PRICE:

A. Seller instructs Broker to market the Property at the following gross sales price: $ _150,000_

   (Listing Price).

B. Seller agrees to sell the Property for the Listing Price or any other price acceptable to Seller. Seller will pay all typical closing costs charged to sellers of commercial real estate in Texas (seller's typical closing costs are those set forth in the commercial contract forms published by the Texas Association of REALTORS®) except SELLER WILL PAY COSTS THAT WILL BE NEGOTIATED

## 4. TERM:

A. This Listing begins on _____ December 1, 2011 _____ and ends at 11:59 p.m. on _____ June 30, 2012 _____. Seller may terminate this Listing on notice to Broker any time after _____ JUNE30 2012 WITH 30 DAYS WRITTEN NOTICE _____

B. If Seller enters into a binding written contract to sell the Property before the date this Listing begins and the contract is binding on the date this Listing begins, this Listing will not commence and will be void.

## 5. BROKER'S FEE:

A. <u>Fee</u>: When earned and payable, Seller will pay Broker a fee of:

☒ (1) _6.000_ % of the sales price.

☐ (2) _____

B. <u>Earned</u>: Broker's fee is earned when any one of the following occurs during this Listing:
  (1) Seller sells, exchanges, agrees to sell, or agrees to exchange all or part of the Property to anyone at any price on any terms;
  (2) Broker individually or in cooperation with another broker procures a buyer ready, willing, and able to buy all or part of the Property at the Listing Price or at any other price acceptable to Seller;
  (3) Seller grants or agrees to grant to another person an option to purchase all or part of the Property;
  (4) Seller transfers or agrees to transfer all or part of Seller's interest (stock or shares) in any entity that holds title to all or part of the Property for the purpose of conveying all or part of the Property to another person; or
  (5) Seller breaches this Listing.

C. <u>Payable</u>: Once earned, Broker's fee is payable either during this Listing or after it ends at the earlier of:
  (1) the closing and funding of any sale or exchange of all or part of the Property;
  (2) Seller's refusal to sell the Property after Broker's Fee has been earned;
  (3) Seller's breach of this Listing; or
  (4) at such time as otherwise set forth in this Listing.

Broker's fee is <u>not</u> payable if a sale of the Property does not close or fund as a result of: (i) Seller's failure, without fault of Seller, to deliver to a buyer a deed or a title policy as required by the contract to sell; (ii) loss of ownership due to foreclosure or other legal proceeding; or (iii) Seller's failure to restore the Property, as a result of a casualty loss, to its previous condition by the closing date set forth in a contract for the sale of the Property.

D. <u>Other Fees</u>:

  (1) <u>Lease of Property</u>: If, during this Listing, Broker procures a tenant to lease all or part of the Property and Seller agrees to lease all or part of the Property to the tenant, Seller will pay Broker at the time

8304 PARK PLACE BLVD
Commercial Listing concerning HOUSTON,        77017

the lease is executed the fee described below. If, during the term of the lease, the tenant agrees to purchase all or part of the Property, Seller will pay Broker the fee specified in Paragraph 5A in addition to the amount described below.

☒ (a) __6.000__ % of all base rents to be paid over the term of the lease and the same percentage of the following items to be paid over the term of the lease: ☐ expense reimbursements; and
☒ ANY RENEWAL TERMS

☐ (b) N/A        $ 1,700 Lease Fee

(2) Breach by Buyer Under Contract: If Seller collects earnest money, the sales price, or damages by suit, compromise, settlement or otherwise from a buyer who breaches a contract for the sale of all or part of the Property entered into during this Listing, Seller will pay Broker, after deducting attorney's fees and collection expenses, an amount equal to the lesser of one-half of the amount collected after deductions or the amount of the Broker's Fee stated in Paragraph 5A. Any amount paid under this Paragraph 5D(2) is in addition to any amount that Broker may be entitled to receive for subsequently selling the Property.

(3) Service Providers: If Broker refers Seller or a prospective buyer or tenant to a service provider (e.g., mover, cable company, telecommunications provider, utility, or contractor) Broker may receive a fee from the service provider for the referral. Any referral fee Broker receives under this Paragraph 5D(3) is in addition to any other compensation Broker may receive under this Listing.

(4) Transaction Fees and/or Reimbursable Expenses: N/A

E. Protection Period:

(1) "Protection period" means that time starting the day after this Listing ends and continuing for __90__ days.

(2) Not later than 10 days after this Listing ends Broker may send Seller written notice specifying the names of persons whose attention Broker has called to the Property during this Listing. If Seller agrees to sell or lease all or part of the Property during the protection period to a person named in the notice or to a relative or business associate of a person named in the notice, Seller will pay Broker, upon the closing of the sale or upon execution of the lease, the amount Broker would have been entitled to receive if this Listing were still in effect.

(3) "Person" means any person in any capacity whether an individual or entity. "Sell" means any transfer of any interest in the Property whether by agreement or option.

(4) This Paragraph 5E survives termination of this Listing.

F. County: All amounts payable to Broker are to be paid in cash in _____HARRIS_____ County, Texas.

G. Escrow Authorization: Seller authorizes, and Broker may so instruct, any escrow or closing agent authorized to close a transaction for the purchase or acquisition of the Property to collect and disburse to Broker all amounts payable to Broker under this Listing.

NOTICE: Under Chapter 62, Texas Property Code, Broker is entitled to claim a lien against the Property to secure payment of an earned commission.

(TAR-1301) 1-26-10        Initialed for Identification by Seller R. H. and Broker/Associate ___        Page 3 of 9

8304 PARK PLACE BLVD
Commercial Listing concerning HOUSTON,     77017
_____

## 6. EXCLUSIONS:

A. Under a prior listing agreement Seller is obligated to pay another Texas licensed broker a fee if Seller sells or leases all or part of the Property before _____ N/A _____ to any of the following persons: _____
_____ (named exclusions).

B. If Seller enters into a contract to sell or lease all or part of the Property to a named exclusion before the date specified in Paragraph 6A, Seller will not be obligated to pay Broker the fees under Paragraph 5 of this Listing, but Seller will pay Broker, upon the closing of the sale or upon execution of the lease, a fee equal to:
   (1) __N/A__ % of the sales price if Seller sells the Property;
   (2) __N/A__ % of all base rents to be paid over the term of the lease if Seller leases the Property and the same percentage of the following items to be paid over the term of the lease: ☐ expense reimbursements; ☐ N/A _____ ; and
   (3) _____
   _____ .

C. If Seller enters into a contract to sell or lease all or part of the Property to a named exclusion, Broker ☐ will ☐ will not assist Seller in negotiating and closing the sale or lease to the named exclusion.

## 7. ACCESS TO THE PROPERTY:
Authorizing access to the Property means giving permission to another person to enter the Property, disclosing security codes necessary to enter the Property to such person, and lending a key to the Property to such person. To facilitate the showing and sale of the Property, Seller instructs Broker and Broker's associates to: (i) access the Property at reasonable times; (ii) authorize other brokers, inspectors, appraisers, lenders, engineers, surveyors, and repair persons to enter the Property at reasonable times; and (iii) duplicate keys to facilitate convenient and efficient showings.

## 8. COOPERATION WITH OTHER BROKERS:
Broker will allow other brokers to show the Property to prospective buyers. If the other broker procures a buyer who purchases the Property, Broker will offer to pay the other broker a portion of Broker's fee under Paragraph 5.

## 9. INTERMEDIARY: (Check A or B only.)

☒ A. Intermediary Status: Broker may show the Property to interested prospective buyers or tenants who Broker represents. If a prospect who Broker represents offers to buy or lease the Property, Seller authorizes Broker to act as an intermediary and Broker will notify Seller that Broker will service the parties in accordance with one of the following alternatives.

   (1) If a prospect who Broker represents is serviced by an associate other than the associate servicing Seller under this Listing, Broker may notify Seller that Broker will: (a) appoint the associate then servicing Seller to communicate with, carry out instructions of, and provide opinions and advice during negotiations to Seller; and (b) appoint the associate then servicing the prospect to the prospect for the same purpose.

   (2) If a prospect who Broker represents is serviced by the same associate who is servicing Seller, Broker may notify Seller that Broker will: (a) appoint another associate to communicate with, carry out instructions of, and provide opinions and advice during negotiations to the prospect; and (b) appoint the associate servicing the Seller under this Listing to the Seller for the same purpose.

   (3) Broker may notify Seller that Broker will make no appointments as described under this Paragraph 9A and, in such an event, the associate servicing the parties will act solely as Broker's intermediary representative, who may facilitate the transaction but will not render opinions or advice during negotiations to either party.

(TAR-1301) 1-26-10        Initialed for Identification by Seller R , H  and Broker/Associate _____        Page 4 of 9

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    Untitled

8304 PARK PLACE BLVD
Commercial Listing concerning HOUSTON,    77017

☐ B. <u>No Intermediary Status</u>: Seller agrees that Broker will not show the Property to prospects who Broker represents.

**Notice:**    If Broker acts as an intermediary under Paragraph 9A, Broker and Broker's associates:
- may not disclose to the prospect that Seller will accept a price less than the asking price unless otherwise instructed in a separate writing by Seller;
- may not disclose to Seller that the prospect will pay a price greater than the price submitted in a written offer to Seller unless otherwise instructed in a separate writing by the prospect;
- may not disclose any confidential information or any information Seller or the prospect specifically instructs Broker in writing not to disclose unless otherwise instructed in a separate writing by the respective party or required to disclose the information by the Real Estate License Act or a court order or if the information materially relates to the condition of the property;
- may not treat a party to the transaction dishonestly; and
- may not violate the Real Estate License Act.

10. **CONFIDENTIAL INFORMATION:** During this Listing or after it ends, Broker may not knowingly disclose information obtained in confidence from Seller except as authorized by Seller or required by law. Broker may not disclose to Seller any information obtained in confidence regarding any other person Broker represents or may have represented except as required by law.

11. **BROKER'S AUTHORITY:**

A.   Broker will use reasonable efforts and act diligently to market the Property for sale, procure a buyer, and negotiate the sale of the Property.

B.   In addition to other authority granted by this Listing, Broker may:
   (1) advertise the Property by means and methods as Broker determines is appropriate in any media, including but not limited to:
   (a) placing a "For Sale" sign or similar marketing sign on the Property; and
   (b) creating and placing information about the Property (including interior and exterior photographs or videos):
      (i)  on the Internet on Broker's website and on other websites as Broker determines;
      (ii) in any advertisements whether in print or electronic media; and
      (iii) into listing services that may publicize the information on the Internet or by other means;
   (2) reproduce, display, and distribute information about the Property, including the information described under Paragraph 11B(1), for the purposes of marketing the Property;
   (3) furnish comparative marketing and sales information about other properties to prospects;
   (4) disseminate information about the Property to other Brokers and prospects, including applicable disclosures, notices, or other information that Seller is required to make under law or a contract;
   (5) obtain information from any holder of any note secured by a lien on the Property;
   (6) accept, in trust, any earnest money, option fee, security deposit, or other money related to the purchase or lease of the Property and deliver such money for deposit in accordance with a contract for the sale or lease of the Property;
   (7) disclose the sales price and terms of a sale or a lease to other brokers, appraisers, other real estate professionals, and any listing services into which information about the Property is placed;
   (8) place information about this Listing and a transaction for the Property on an electronic platform (an electronic platform is typically an Internet-based system where professionals related to the transaction, such as title companies and lenders, may receive, view, and input information); and
   (9) advertise that Broker "sold" or "leased" the Property after the closing of a sale or execution of a lease of the Property in which Broker was involved.

   *NOTICE: Any submission of information to a listing service must be made in accordance with listing service's rules.*

8304 PARK PLACE BLVD
Commercial Listing concerning HOUSTON,      77017

C. Broker is not authorized to execute any document in the name of or on behalf of Seller concerning the Property.

D. Photographs, videos, and compilations of information submitted to a listing service are the property of the listing service for all purposes.

## 12. REPRESENTATIONS:

A. Except as provided otherwise in this Listing, Seller represents that:
   (1) Seller has fee simple title to and peaceable possession of the Property and all its improvements and fixtures thereon, unless rented, and the legal capacity to convey the Property;
   (2) Seller is not bound by a listing agreement with another broker for the sale, exchange, or lease of the Property that is or will be in effect during this Listing;
   (3) no person or entity has any right to purchase, lease, or acquire the Property by an option, right of refusal, or other agreement;
   (4) there are no delinquencies or defaults under any deed of trust, mortgage, or other encumbrance on the Property;
   (5) the Property is not subject to the jurisdiction of any court;
   (6) Seller owns sufficient intellectual property rights in any materials which Seller provides to Broker related to the Property (for example, brochures, photographs, drawings, or articles) to permit Broker to reproduce and distribute such materials for the purposes of marketing the Property or for other purposes related to this agreement; and
   (7) all information relating to the Property Seller provides to Broker is true and correct to the best of Seller's knowledge.

B. Seller and Broker must disclose any known material defect in the Property to a prospective buyer. *(Check only one box.)*

☐ (1) Seller is not aware of any material defects to the Property except as stated in the attached Property Condition Statement. Seller authorizes Broker to furnish prospective buyers and other brokers with a copy of the Property Condition Statement.

☒ (2) Except as otherwise provided in this Listing, Seller is not aware of:
   (a) any subsurface: structures, pits, wastes, springs, or improvements;
   (b) any pending or threatened litigation, condemnation, or assessment affecting the Property;
   (c) any environmental hazards or conditions that materially affect the Property;
   (d) whether the Property is or has ever been used for the storage or disposal of hazardous materials or toxic waste, a dump site or landfill, or any underground tanks or containers;
   (e) whether radon, asbestos containing materials, urea-formaldehyde foam insulation, lead-based paint, toxic mold (to the extent that it adversely affects the health of ordinary occupants) or other pollutants or contaminants of any nature now exist or have ever existed on the Property;
   (f) any wetlands, as defined by federal or state law or regulation, on the Property;
   (g) any threatened or endangered species or their habitat on the Property;
   (h) any present or past infestation of wood-destroying insects in the Property's improvements;
   (i) any contemplated material changes to the Property or surrounding area that would materially and detrimentally affect the ordinary use of the Property;
   (j) any material physical defects in the improvements on the Property; or
   (k) any condition on the Property that violates any law or ordinance.

   *(List any exceptions to (a)-(k) in Special Provisions or an addendum.)*

## 13. SELLER'S ADDITIONAL PROMISES: Seller agrees to:

A. cooperate with Broker to facilitate the showing and marketing of the Property;
B. not negotiate with any prospective buyer who may contact Seller directly, but refer all prospective buyers to Broker;
C. not enter into a listing agreement with another Broker for the sale or exchange of the Property to become effective during this Listing;

(TAR-1301) 1-26-10          Initialed for Identification by Seller R. H. and Broker/Associate          Page 6 of 9

8304 PARK PLACE BLVD

Commercial Listing concerning HOUSTON,        77017

D. not enter into a listing agreement for the lease of all or part of the Property with another broker to become effective during this Listing without Broker's written permission;

E. provide Broker with copies of the following, if any, relating to the Property: a current rent roll, all leases including any amendments, architectural plans and drawings, renderings, survey, a current operating statement, environmental inspection reports, engineering reports, and other relevant information that Broker may request during this Listing;

F. advise Broker of any tenants moving in or out of the Property;

G. complete any disclosures or notices required by law or a contract to sell the Property;

H. amend any applicable notices and disclosures if any material change occurs during this Listing; and

I. at Seller's expense, remove from the Property all:
   (1) "For Sale" (or similarly worded) signs other than Broker's signs;
   (2) "For Lease" (or similarly worded) signs from the Property unless the Property is listed for lease with another broker; and
   (3) "For Information" (or similarly worded) signs other than Broker's signs.

## 14. LIMITATION OF LIABILITY:

A. If the Property is or becomes vacant during this Listing, Seller must notify Seller's casualty insurance company and request a "vacancy clause" to cover the Property. Broker is not responsible for the security of the Property nor for inspecting the Property on any periodic basis.

B. Broker is not responsible or liable in any manner for personal injury to any person or for loss or damage to any person's real or personal property resulting from any act or omission not caused by Broker, including but not limited to injuries or losses caused by:
   (1) other brokers, inspectors, appraisers, lenders, contractors, surveyors, engineers, and other persons who are authorized to access the Property;
   (2) acts of third parties (for example, vandalism or theft);
   (3) freezing or broken water pipes;
   (4) a dangerous condition on the Property; and
   (5) the Property's non-compliance with any law or ordinance.

C. Seller agrees to indemnify and hold Broker and Broker's associates harmless from any damages, costs, attorney's fees, and expenses:
   (1) that arise from Seller's failure to disclose any material information about the Property;
   (2) that are caused by Seller giving incorrect information to Broker, other brokers, or prospects;
   (3) that arise from any claim for misuse of intellectual property in any materials or information that Seller provided to Broker related to the Property or this agreement; or
   (4) that are otherwise caused by Seller or Seller's negligence.

## 15. SPECIAL PROVISIONS: IF BROKER LEASES PROPERTY OWNER WILL:

PUT HVAC IN GOOD WORKING ORDER

REPLACE INSIDE CEILING TILE

REPAIR PARKING LOT

PAINT OUTSIDE OF BUILDING

MAINTAIN ROOF OF BUILDING AND OUTSIDE WALLS

(TAR-1301) 1-26-10          Initialed for Identification by Seller R. , H. and Broker/Associate          Page 7 of 9

8304 PARK PLACE BLVD
Commercial Listing concerning HOUSTON,       77017

**16. DEFAULT:** If Seller breaches this Listing, Seller is in default and will be liable to Broker for the amount of Broker's fee specified in Paragraph 5A and any other fees Broker is entitled to receive under this Listing. If a sales price is not determinable in the event of any exchange or breach of this Listing, the Listing Price will be the sales price for the purpose of calculating Broker's fee. If Broker breaches this Listing, Broker is in default and Seller may exercise any remedy at law.

**17. MEDIATION:** The parties agree to negotiate in good faith in an effort to resolve any dispute that may arise between the parties. If the dispute cannot be resolved by negotiation, the parties will submit the dispute to mediation. The parties to the dispute will choose a mutually acceptable mediator and will share the costs of mediation equally.

**18. ATTORNEY'S FEES:** If Seller or Broker is a prevailing party in any legal proceeding brought as a result of a dispute under this Listing or any transaction related to or contemplated by this Listing, such party may recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees.

**19. ADDENDA:** Addenda or information that are part of this Listing are:
- ☒ A. Information About Brokerage Services
- ☐ B. Property Description Exhibit identified in Paragraph 2
- ☐ C. Condominium Addendum to Listing (TAR-1401)
- ☐ D. Commercial Property Condition Statement (TAR-1408)
- ☐ E. Information About On-Site Sewer Facility(TAR-1407)
- ☐ F. Information about Special Flood Hazard Areas (TAR-1414)
- ☐ G. _____

**20. AGREEMENT OF THE PARTIES:**

A. <u>Entire Agreement</u>: This Listing is the entire agreement of the parties and may not be changed except by written agreement.

B. <u>Assignability</u>: Neither party may assign this Listing without the written consent of the other party.

C. <u>Binding Effect</u>: Seller's obligations to pay Broker an earned fee is binding upon Seller and Seller's heirs, administrators, executors, successors, and permitted assigns.

D. <u>Joint and Several</u>: All Sellers executing this Listing are jointly and severally liable for the performance of all its terms.

E. <u>Governing Law</u>: Texas law governs the interpretation, validity, performance, and enforcement of this Listing.

F. <u>Severability</u>: If a court finds any clause in this Listing invalid or unenforceable, the remainder of this Listing will not be affected and all other provisions of this Listing will remain valid and enforceable.

G. <u>Partial Sales or Leases</u>: If Seller sells or leases part of the Property before the date this Listing ends, this Listing will continue for the remaining part of the Property through the term of this Listing.

H. <u>Notices</u>: Notices between the parties must be in writing and are effective when sent to the receiving party's address, fax, or e-mail specified in Paragraph 1.

**21. ADDITIONAL NOTICES:**

A. **Broker's fees or the sharing of fees between brokers are not fixed, controlled, recommended, suggested, or maintained by the Texas Association of REALTORS®, its local affiliates, or any listing service. Broker's fees are negotiable.**

(TAR-1301) 1-26-10       Initialed for Identification by Seller R-, H' and Broker/Associate       Page 8 of 9

8304 PARK PLACE BLVD

Commercial Listing concerning HOUSTON,        77017

B. The Property must be made available to all persons without regard to race, color, religion, national origin, sex, disability, or familial status. Local ordinances may provide for additional protected classes (e.g.; creed, status as a student, marital status, sexual orientation, or age).

C. If the Property contains a residential dwelling built before 1978, federal law requires the Seller to: (1) provide the buyer with the promulgated lead hazard information pamphlet (TAR-2511); and (2) disclose the presence of any known lead-based paint or lead-based paint hazards.

D. Broker cannot give legal advice. This is a legally binding agreement. READ IT CAREFULLY. If you do not understand the effect of this Listing, consult your attorney BEFORE signing.

Seller: _Rosa M. Huerta_                     Broker:

By: ROSA M HUERTA                            SAN SEBASTIAN REALTY CO.
                                             Broker / Company Name: INC.
                                                              License No. 050 p 586

By (signature): _____      By (signature): _____
Printed Name: _____      Printed Name: _____
Title: _____ Date: _____        Title _____ License No. _____
                                                                   Date: _____

By: ROEL HUERTA _____

By (signature): _____
Printed Name: _____
Title: _____ Date: _____

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    Untitled

Approved by the Texas Real Estate Commission for Voluntary Use

*Texas law requires all real estate licensees to give the following information
about brokerage services to prospective buyers, tenants, sellers and landlords.*

# Information About Brokerage Services

Before working with a real estate broker, you should know that the duties of a broker depend on whom the broker represents. If you are a prospective seller or landlord (owner) or a prospective buyer or tenant (buyer), you should know that the broker who lists the property for sale or lease is the owner's agent. A broker who acts as a subagent represents the owner in cooperation with the listing broker. A broker who acts as a buyer's agent represents the buyer. A broker may act as an intermediary between the parties if the parties consent in writing. A broker can assist you in locating a property, preparing a contract or lease, or obtaining financing without representing you. A broker is obligated by law to treat you honestly.

## IF THE BROKER REPRESENTS THE OWNER:
The broker becomes the owner's agent by entering into an agreement with the owner, usually through a written - listing agreement, or by agreeing to act as a subagent by accepting an offer of subagency from the listing broker. A subagent may work in a different real estate office. A listing broker or subagent can assist the buyer but does not represent the buyer and must place the interests of the owner first. The buyer should not tell the owner's agent anything the buyer would not want the owner to know because an owner's agent must disclose to the owner any material information known to the agent.

## IF THE BROKER REPRESENTS THE BUYER:
The broker becomes the buyer's agent by entering into an agreement to represent the buyer, usually through a written buyer representation agreement. A buyer's agent can assist the owner but does not represent the owner and must place the interests of the buyer first. The owner should not tell a buyer's agent anything the owner would not want the buyer to know because a buyer's agent must disclose to the buyer any material information known to the agent.

## IF THE BROKER ACTS AS AN INTERMEDIARY:
A broker may act as an intermediary between the parties if the broker complies with The Texas Real Estate License Act. The broker must obtain the written consent of each party to the transaction to act as an intermediary. The written consent must state who will pay the broker and, in conspicuous bold or underlined print, set forth the broker's obligations as an intermediary. The broker is required to treat each party honestly and fairly and to comply with The Texas Real Estate License Act. A broker who acts as an intermediary in a transaction:

(1) shall treat all parties honestly;
(2) may not disclose that the owner will accept a price less than the asking price unless authorized in writing to do so by the owner;
(3) may not disclose that the buyer will pay a price greater than the price submitted in a written offer unless authorized in writing to do so by the buyer; and
(4) may not disclose any confidential information or any information that a party specifically instructs the broker in writing not to disclose unless authorized in writing to disclose the information or required to do so by The Texas Real Estate License Act or a court order or if the information materially relates to the condition of the property.

With the parties' consent, a broker acting as an intermediary between the parties may appoint a person who is licensed under The Texas Real Estate License Act and associated with the broker to communicate with and carry out instructions of one party and another person who is licensed under that Act and associated with the broker to communicate with and carry out instructions of the other party.

**If you choose to have a broker represent you,**
you should enter into a written agreement with the broker that clearly establishes the broker's obligations and your obligations. The agreement should state how and by whom the broker will be paid. You have the right to choose the type of representation, if any, you wish to receive. Your payment of a fee to a broker does not necessarily establish that the broker represents you. If you have any questions regarding the duties and responsibilities of the broker, you should resolve those questions before proceeding.

Real estate licensee asks that you acknowledge receipt of this information about brokerage services for the licensee's records.

_____     11-30-11
Buyer, Seller, Landlord or Tenant                        Date

Texas Real Estate Brokers and Salespersons are licensed and regulated by the Texas Real Estate Commission (TREC). If you have a question or complaint regarding a real estate licensee, you should contact TREC at P.O. Box 12188, Austin, Texas 78711-2188 or 512-465-3960.

01A          TREC No. OP-K
(TAR-2501) 1/1/96                                                              Page 1 of 1
San Sebastian Realty Inc. PO Box 751653 Houston, TX 77275
Phone: 7132990109          Fax: 281.335.0633          Gene Surrency                    Untitled
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com



**EXHIBIT**

_6_





## TEXAS ASSOCIATION OF REALTORS®

# COMMERCIAL LEASE

USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2010

1. **PARTIES:** The parties to this lease are:

   Landlord: _Rosa And Roel Huerta_ ; and

   Tenant: _Richard Nichols_ .

2. **LEASED PREMISES:**

   A. Landlord leases to Tenant the following described real property, known as the "leased premises," along with all its improvements (*Check only one box*):

   ☐ (1) <u>Multiple-Tenant Property</u>: Suite or Unit Number _____ containing approximately _____ (project name) square feet of rentable area in _____ at _____ (city), _____ (county), (address) in_____ Texas, which is legally described on attached Exhibit _____ or as follows:
   _____
   _____

   ☑ (2) <u>Single-Tenant Property</u>: The real property at: _8304 Park Place_ (address) in _Houston, 77017_ (city), _Harris_ (county), Texas, which is legally described on attached Exhibit _N/A_ or as follows: _N/A_
   _____
   _____

   B. If Paragraph 2A(1) applies:
   (1) "Property" means the building or complex in which the leased premises are located, inclusive of any common areas, drives, parking areas, and walks; and
   (2) the parties agree that the rentable area of the leased premises may not equal the actual or useable area within the leased premises and may include an allocation of common areas in the Property. The rentable area ☐ will ☑ will not be adjusted if re-measured.

3. **TERM:**

   A. <u>Term</u>: The term of this lease is ___60___ months and ___0___ days, commencing on:
   _Date of Occupancy Permit And Beer Lice_ (Commencement Date)
   and ending on _(Fifty Nine) 59 months Later_ (Expiration Date).

Commercial Lease concerning: _____

B. **Delay of Occupancy:** If Tenant is unable to occupy the leased premises on the Commencement Date because of construction on the leased premises to be completed by Landlord that is not substantially complete or a prior tenant's holding over of the leased premises, Landlord will not be liable to Tenant for such delay and this lease will remain enforceable. In the event of such a delay, the Commencement Date will automatically be extended to the date Tenant is able to occupy the Property and the Expiration Date will also be extended by a like number of days, so that the length of this lease remains unchanged. If Tenant is unable to occupy the leased premises after the 90th day after the Commencement Date because of construction on the leased premises to be completed by Landlord that is not substantially complete or a prior tenant's holding over of the leased premises, Tenant may terminate this lease by giving written notice to Landlord before the leased premises become available to be occupied by Tenant and Landlord will refund to Tenant any amounts paid to Landlord by Tenant. This Paragraph 3B does not apply to any delay in occupancy caused by cleaning or repairs.

C. Unless the parties agree otherwise, Tenant is responsible for obtaining a certificate of occupancy for the leased premises if required by a governmental body.

4. **RENT AND EXPENSES:**

A. **Base Monthly Rent:** On or before the first day of each month during this lease, Tenant will pay Landlord base monthly rent as described on attached Exhibit _____ N/A _____ or as follows:

| Dates | | Rate per rentable square foot (optional) | | Base Monthly Rent $ |
|---|---|---|---|---|
| From | To | $ Monthly Rate | $ Annual Rate | |
| 1st Month | 12th Month | / rsf / month | / rsf / year | 4,000.00 |
| 13th Month | 48 Month | / rsf / month | / rsf / year | 4,200.00 |
| | | / rsf / month | / rsf / year | |
| | | / rsf / month | / rsf / year | |
| | | / rsf / month | / rsf / year | |

B. **Additional Rent:** In addition to the base monthly rent, Tenant will pay Landlord all other amounts, as provided by the attached (Check all that apply.):
  ☐ (1) Commercial Lease Addendum for Expense Reimbursement (TAR-2103)
  ☐ (2) Commercial Lease Addendum for Percentage Rent (TAR-2106)
  ☐ (3) Commercial Lease Addendum for Parking (TAR-2107)
  ☑ (4) N/A
  All amounts payable under the applicable addenda are deemed to be "rent" for the purposes of this lease.

C. **First Full Month's Rent:** The first full monthly rent is due on or before _Tenant's Receipt_ _of Occupancy Permit and Beer License; No Later than 90 days_ _After Lease Execution_

D. **Prorated Rent:** If the Commencement Date is on a day other than the first day of a month, Tenant will pay Landlord as prorated rent, an amount equal to the base monthly rent multiplied by the following fraction: the number of days from the Commencement Date to the first day of the following month divided by the number of days in the month in which this lease commences. The prorated rent is due on or before the Commencement Date.

E. **Place of Payment:** Tenant will remit all amounts due Landlord under this lease to the following person at the place stated or to such other person or place as Landlord may later designate in writing:

Name: _Rosa and Raul Huerta_
Address: _3215 Broadway St 1_
_Houston Texas 77017_

Commercial Lease concerning: _____

F. **Method of Payment**: Tenant must pay all rent timely without demand, deduction, or offset, except as permitted by law or this lease. If Tenant fails to timely pay any amounts due under this lease or if any check of Tenant is returned to Landlord by the institution on which it was drawn, Landlord after providing written notice to Tenant may require Tenant to pay subsequent amounts that become due under this lease in certified funds. This paragraph does not limit Landlord from seeking other remedies under this lease for Tenant's failure to make timely payments with good funds.

G. **Late Charges**: If Landlord does not <u>actually receive</u> a rent payment at the designated place of payment within 5 days after the date it is due, Tenant will pay Landlord a late charge equal to 5% of the amount due. In this paragraph, the mailbox is not the agent for receipt for Landlord. The late charge is a cost associated with the collection of rent and Landlord's acceptance of a late charge does not waive Landlord's right to exercise remedies under Paragraph 20.

H. **Returned Checks**: Tenant will pay $ _35.00_ for each check Tenant tenders to Landlord which is returned by the institution on which it is drawn for any reason, plus any late charges until Landlord receives payment.

5. **SECURITY DEPOSIT:**

A. Upon execution of this lease, Tenant will pay $ _1200.00_ to Landlord as a security deposit.

B. Landlord may apply the security deposit to any amounts owed by Tenant under this lease. If Landlord applies any part of the security deposit during any time this lease is in effect to amounts owed by Tenant, Tenant must, within 10 days after receipt of notice from Landlord, restore the security deposit to the amount stated.

C. Within 60 days after Tenant surrenders the leased premises and provides Landlord written notice of Tenant's forwarding address, Landlord will refund the security deposit less any amounts applied toward amounts owed by Tenant or other charges authorized by this lease.

6. **TAXES:** Unless otherwise agreed by the parties, Landlord will pay all real property ad valorem taxes assessed against the leased premises.

7. **UTILITIES:**

A. The party designated below will pay for the following utility charges to the leased premises and any connection charges for the utilities. *(Check all that apply.)*

| | N/A | Landlord | Tenant |
|---|---|---|---|
| (1) Water | ☐ | ☐ | ☑ |
| (2) Sewer | ☐ | ☐ | ☑ |
| (3) Electric | ☐ | ☐ | ☑ |
| (4) Gas | ☐ | ☐ | ☑ |
| (5) Telephone | ☐ | ☐ | ☑ |
| (6) Internet | ☐ | ☐ | ☑ |
| (7) Cable | ☐ | ☐ | ☑ |
| (8) Trash | ☐ | ☐ | ☑ |
| (9) _N/A_ | ☐ | ☐ | ☐ |
| (10) All other utilities | | | |

B. The party responsible for the charges under Paragraph 7A will pay the charges directly to the utility service provider. The responsible party may select the utility service provider except that if Tenant selects the provider, any access or alterations to the Property or leased premises necessary for the utilities may be made only with Landlord's prior consent, which Landlord will not unreasonably withhold. If Landlord incurs any liability for utility or connection charges for which Tenant is responsible to pay and Landlord pays such amount, Tenant will immediately upon written notice from Landlord reimburse Landlord such amount.

Initialed for Identification by Landlord: _R.H._, _P.H._, and Tenant: _____    Page 4 of 15

Commercial Lease concerning: _____

C. **Notice:** Tenant should determine if all necessary utilities are available to the leased premises and are adequate for Tenant's intended use.

D. **After-Hours HVAC Charges:** "HVAC services" means heating, ventilating, and air conditioning of the leased premises. *(Check one box only.)*

☐ (1) Landlord is obligated to provide the HVAC services to the leased premises only during the Property's operating hours specified under Paragraph 9C.

☐ (2) Landlord will provide the HVAC services to the leased premises during the operating hours specified under Paragraph 9C for no additional charge and will, at Tenant's request, provide HVAC services to the leased premises during other hours for an additional charge of $ _____ *N/A* per hour. Tenant will pay Landlord the charges under this paragraph immediately upon receipt of Landlord's invoice. Hourly charges are charged on a half-hour basis. Any partial hour will be rounded up to the next half hour. Tenant will comply with Landlord's procedures to make a request to provide the additional HVAC services under this paragraph.

☐ (3) Tenant will pay for the HVAC services under this lease.

8. **INSURANCE:**

A. During all times this lease is in effect, Tenant must, at Tenant's expense, maintain in full force and effect from an insurer authorized to operate in Texas:
(1) public liability insurance naming Landlord as an additional insured with policy limits on an occurrence basis in a minimum amount of: *(check only (a) or (b) below)*
☑ (a) $1,000,000; or
☐ (b) $2,000,000.
If neither box is checked the minimum amount will be $1,000,000.
(2) personal property damage insurance for the business operations being conducted in the leased premises and contents in the leased premises in an amount sufficient to replace such contents after a casualty loss; and
☐ (3) business interruption insurance sufficient to pay 12 months of rent payments;

B. Before the Commencement Date, Tenant must provide Landlord with a copy of insurance certificates evidencing the required coverage. If the insurance coverage is renewed or changes in any manner or degree at any time this lease is in effect, Tenant must, not later than 10 days after the renewal or change, provide Landlord a copy of an insurance certificate evidencing the renewal or change.

C. If Tenant fails to maintain the required insurance in full force and effect at all times this lease is in effect, Landlord may:
(1) purchase insurance that will provide Landlord the same coverage as the required insurance and Tenant must immediately reimburse Landlord for such expense; or
(2) exercise Landlord's remedies under Paragraph 20.

D. Unless the parties agree otherwise, Landlord will maintain in full force and effect insurance for: (1) fire and extended coverage in an amount to cover the reasonable replacement cost of the improvements of the Property; and (2) any public liability insurance in an amount that Landlord determines reasonable and appropriate.

E. If there is an increase in Landlord's insurance premiums for the leased premises or Property or its contents that is caused by Tenant, Tenant's use of the leased premises, or any improvements made by or for Tenant, Tenant will, for each year this lease is in effect, pay Landlord the increase immediately after Landlord notifies Tenant of the increase. Any charge to Tenant under this Paragraph 8E will be equal to the actual amount of the increase in Landlord's insurance premium.

Commercial Lease concerning: _____

## 9. USE AND HOURS:

A. Tenant may use the leased premises for the following purpose and no other: _ICE HOUSE_
_____
_____ .

B. Unless otherwise specified in this lease, Tenant will operate and conduct its business in the leased premises during business hours that are typical of the industry in which Tenant represents it operates.

C. The Property maintains operating hours of (specify hours, days of week, and if inclusive or exclusive of weekends and holidays): _8:00 AM TO 2:00 AM_
_____ .

## 10. LEGAL COMPLIANCE:

A. Tenant may not use or permit any part of the leased premises or the Property to be used for:
(1) any activity which is a nuisance or is offensive, noisy, or dangerous;
(2) any activity that interferes with any other tenant's normal business operations or Landlord's management of the Property;
(3) any activity that violates any applicable law, regulation, zoning ordinance, restrictive covenant, governmental order, owners' association rules, tenants' association rules, Landlord's rules or regulations, or this lease;
(4) any hazardous activity that would require any insurance premium on the Property or leased premises to increase or that would void any such insurance;
(5) any activity that violates any applicable federal, state, or local law, including but not limited to those laws related to air quality, water quality, hazardous materials, wastewater, waste disposal, air emissions, or other environmental matters;
(6) the permanent or temporary storage of any hazardous material; or
(7) _N/A_
_____
_____ .

B. "Hazardous material" means any pollutant, toxic substance, hazardous waste, hazardous material, hazardous substance, solvent, or oil as defined by any federal, state, or local environmental law, regulation, ordinance, or rule existing as of the date of this lease or later enacted.

C. Landlord does not represent or warrant that the leased premises or Property conform to applicable restrictions, zoning ordinances, setback lines, parking requirements, impervious ground cover ratio requirements, and other matters that may relate to Tenant's intended use. Tenant must satisfy itself that the leased premises may be used as Tenant intends by independently investigating all matters related to the use of the leased premises or Property. Tenant agrees that it is not relying on any warranty or representation made by Landlord, Landlord's agent, or any broker concerning the use of the leased premises or Property.

## 11. SIGNS:

A. Tenant may not post or paint any signs or place any decoration outside the leased premises or on the Property without Landlord's written consent. Landlord may remove any unauthorized sign or decorations, and Tenant will promptly reimburse Landlord for its cost to remove any unauthorized sign or decorations.

B. Any authorized sign must comply with all laws, restrictions, zoning ordinances, and any governmental order relating to signs on the leased premises or Property. Landlord may temporarily remove any authorized sign to complete repairs or alterations to the leased premises or the Property.

(TAR-2101) 1-26-10      Initialed for Identification by Landlord: _R.H: R.H_ and Tenant: _____      Page 6 of 15

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Commercial Lease concerning: _____

C. By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all signs that were placed on the Property or leased premises by or at the request of Tenant. Any signs that Landlord does not require Tenant to remove and that are fixtures, become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

## 12. ACCESS BY LANDLORD:

A. During Tenant's normal business hours Landlord may enter the leased premises for any reasonable purpose, including but not limited to purposes for repairs, maintenance, alterations, and showing the leased premises to prospective tenants or purchasers. Landlord may access the leased premises after Tenant's normal business hours if: (1) entry is made with Tenant's permission; or (2) entry is necessary to complete emergency repairs. Landlord will not unreasonably interfere with Tenant's business operations when accessing the leased premises.

B. During the last ___60___ days of this lease, Landlord may place a "For Lease" or similarly worded sign in the leased premises.

## 13. MOVE-IN CONDITION:
Tenant has inspected the leased premises and accepts it in its present (as-is) condition unless expressly noted otherwise in this lease or in an addendum. Landlord and any agent have made no express or implied warranties as to the condition or permitted use of the leased premises or Property.

## 14. MOVE-OUT CONDITION AND FORFEITURE OF TENANT'S PERSONAL PROPERTY:

A. At the time this lease ends, Tenant will surrender the leased premises in the same condition as when received, except for normal wear and tear. Tenant will leave the leased premises in a clean condition free of all trash, debris, personal property, hazardous materials, and environmental contaminants.

B. If Tenant leaves any personal property in the leased premises after Tenant surrenders possession of the leased premises, Landlord may: (1) require Tenant, at Tenant's expense, to remove the personal property by providing written notice to Tenant; or (2) retain such personal property as forfeited property to Landlord.

C. "Surrender" means vacating the leased premises and returning all keys and access devices to Landlord. "Normal wear and tear" means deterioration that occurs without negligence, carelessness, accident, or abuse.

D. By providing written notice to Tenant before this lease ends, Landlord may require Tenant, upon move-out and at Tenant's expense, to remove, without damage to the Property or leased premises, any or all fixtures that were placed on the Property or leased premises by or at the request of Tenant. Any fixtures that Landlord does not require Tenant to remove become the property of the Landlord and must be surrendered to Landlord at the time this lease ends.

## 15. MAINTENANCE AND REPAIRS:

A. Cleaning: Tenant must keep the leased premises clean and sanitary and promptly dispose of all garbage in appropriate receptacles. ☐ Landlord ☑ Tenant will provide, at its expense, janitorial services to the leased premises that are customary and ordinary for the property type. Tenant will maintain any grease trap on the Property which Tenant uses, including but not limited to periodic emptying and cleaning, as well as making any modification to the grease trap that may be necessary to comply with any applicable law.

Initialed for Identification by Landlord: _R.H._ _R.H_ and Tenant: _____       Page 7 of 15

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com          Untitled

Commercial Lease concerning: _____

B. <u>Repairs of Conditions Caused by a Party</u>: Each party must promptly repair a condition in need of repair that is caused, either intentionally or negligently, by that party or that party's guests, patrons, invitees, contractors or permitted subtenants.

C. <u>Repair and Maintenance Responsibility</u>: Except as otherwise provided by this Paragraph 15, the party designated below, at its expense, is responsible to maintain and repair the following specified items in the leased premises (if any). The specified items must be maintained in clean and good operable condition. If a governmental regulation or order requires a modification to any of the specified items, the party designated to maintain the item must complete and pay the expense of the modification. The specified items include and relate only to real property in the leased premises. Tenant is responsible for the repair and maintenance of its personal property. (Check all that apply.)

| | N/A | Landlord | Tenant |
|---|---|---|---|
| | | ☑ | ☐ |
| (1) Foundation, exterior walls, roof, and other structural components..... | ☐ | | ☑ |
| (2) Glass and windows ........................................................... | ☐ | | ☑ |
| (3) Fire protection equipment and fire sprinkler systems...................... | ☐ | | |
| (4) Exterior & overhead doors, including closure devices, molding, locks, and hardware .............................................. | ☐ | ☐ | ☑ |
| (5) Grounds maintenance, including landscaping and irrigation systems ........................................... | ☐ | ☐ | ☑ |
| (6) Interior doors, including closure devices, frames, molding, locks, and hardware ................................................... | ☐ | ☐ | ☑ |
| (7) Parking areas and walks ................................................ | ☐ | ☐ | ☑ |
| (8) Plumbing systems, drainage systems and sump pumps ................. | ☐ | ☐ | ☑ |
| (9) Electrical systems, mechanical systems ............................... | ☐ | ☐ | ☑ |
| (10) Ballast and lamp replacement ........................................... | ☐ | ☑ | ☑ |
| (11) Heating, Ventilation and Air Conditioning (HVAC) systems ............. | ☐ | | |
| (12) Signs and lighting: | ☐ | ☐ | ☑ |
| (a) Pylon .......................................................... | ☐ | ☐ | ☑ |
| (b) Facia .......................................................... | ☐ | ☐ | ☑ |
| (c) Monument ....................................................... | ☐ | ☐ | ☑ |
| (d) Door/Suite ..................................................... | ☐ | ☐ | ☑ |
| (e) Other: _____ | ☐ | ☐ | ☑ |
| (13) Extermination and pest control, excluding wood-destroying insects | ☐ | ☐ | ☑ |
| (14) Fences and Gates ....................................................... | ☐ | ☐ | ☑ |
| (15) Storage yards and storage buildings.................................... | ☐ | ☐ | ☐ |
| (16) Wood-destroying insect treatment and repairs ......................... | ☐ | ☐ | ☐ |
| (17) Cranes and related systems ............................................ | | ☐ | ☐ |
| (18) _____ | | ☐ | ☐ |
| (19) _____ | | | |
| (20) All other items and systems. ........................................... | | | |

D. <u>Repair Persons</u>: Repairs must be completed by trained, qualified, and insured repair persons.

E. <u>HVAC Service Contract</u>: If Tenant maintains the HVAC system under Paragraph 15C(11), Tenant ☐ is ☑ is not required to maintain, at its expense, a regularly scheduled maintenance and service contract for the HVAC system. The maintenance and service contract must be purchased from a HVAC maintenance company that regularly provides such contracts to similar properties. If Tenant fails to maintain a required HVAC maintenance and service contract in effect at all times during this lease, Landlord may do so and Tenant will reimburse Landlord for the expense of such maintenance and service contract or Landlord may exercise Landlord's remedies under Paragraph 20.

Commercial Lease concerning: _____

F. <u>Common Areas</u>: Landlord will maintain any common areas in the Property in a manner as Landlord determines to be in the best interest of the Property. Landlord will maintain any elevator and signs in the common area. Landlord may change the size, dimension, and location of any common areas, provided that such change does not materially impair Tenant's use and access to the leased premises. Tenant has the non-exclusive license to use the common areas in compliance with Landlord's rules and regulations. Tenant may not solicit any business in the common areas or interfere with any other person's right to use the common areas. This paragraph does not apply if Paragraph 2A(2) applies.

G. <u>Notice of Repairs</u>: Tenant must promptly notify Landlord of any item that is in need of repair and that is Landlord's responsibility to repair. All requests for repairs to Landlord must be in writing.

H. <u>Failure to Repair</u>: Landlord must make a repair for which Landlord is responsible within a reasonable period of time after Tenant provides Landlord written notice of the needed repair. If Tenant fails to repair or maintain an item for which Tenant is responsible within 10 days after Landlord provides Tenant written notice of the needed repair or maintenance, Landlord may: (1) repair or maintain the item, without liability for any damage or loss to Tenant, and Tenant must immediately reimburse Landlord for the cost to repair or maintain; or (2) exercise Landlord's remedies under Paragraph 20.

16. **ALTERATIONS:**

A. Tenant may not alter (including making any penetrations to the roof, exterior walls or foundation), improve, or add to the Property or the leased premises without Landlord's written consent. Landlord will not unreasonably withhold consent for the Tenant to make reasonable non-structural alterations, modifications, or improvements to the leased premises.

B. Tenant may not alter any locks or any security devices on the Property or the leased premises without Landlord's consent. If Landlord authorizes the changing, addition, or rekeying of any locks or other security devices, Tenant must immediately deliver the new keys and access devices to Landlord.

C. If a governmental order requires alteration or modification to the leased premises, the party obligated to maintain and repair the item to be modified or altered as designated in Paragraph 15 will, at its expense, modify or alter the item in compliance with the order and in compliance with Paragraphs 16A and 17.

D. Any alterations, improvements, fixtures or additions to the Property or leased premises installed by either party during the term of this lease will become Landlord's property and must be surrendered to Landlord at the time this lease ends, except for those fixtures Landlord requires Tenant to remove under Paragraph 11 or 14 or if the parties agree otherwise in writing.

17. **LIENS:** Tenant may not do anything that will cause the title of the Property or leased premises to be encumbered in any way. If Tenant causes a lien to be filed against the Property or leased premises, Tenant will within 20 days after receipt of Landlord's demand: (1) pay the lien and have the lien released of record; or (2) take action to discharge the lien. Tenant will provide Landlord a copy of any release Tenant obtains pursuant to this paragraph.

18. <u>**LIABILITY:** To the extent permitted by law, Landlord is NOT responsible to Tenant or Tenant's employees, patrons, guests, or invitees for any damages, injuries, or losses to person or property caused by:</u>
A. <u>an act, omission, or neglect of: Tenant; Tenant's agent; Tenant's guest; Tenant's employees; Tenant's patrons; Tenant's invitees; or any other tenant on the Property;</u>
B. <u>fire, flood, water leaks, ice, snow, hail, winds, explosion, smoke, riot, strike, interruption of utilities, theft, burglary, robbery, assault, vandalism, other persons, environmental contaminants, or other occurrences or casualty losses.</u>

Initialed for Identification by Landlord: R.H. R.H and Tenant: _____     Page 9 of 15

(TAR-2101) 1-26-10

Commercial Lease concerning: _____

19. **INDEMNITY:** Each party will indemnify and hold the other party harmless from any property damage, personal injury, suits, actions, liabilities, damages, cost of repairs or service to the leased premises or Property, or any other loss caused, negligently or otherwise, by that party or that party's employees, patrons, guests, or invitees.

20. **DEFAULT:**

A. If Landlord fails to comply with this lease within 30 days after Tenant notifies Landlord of Landlord's failure to comply, Landlord will be in default and Tenant may seek any remedy provided by law. If, however, Landlord's non-compliance reasonably requires more than 30 days to cure, Landlord will not be in default if the cure is commenced within the 30-day period and is diligently pursued.

B. If Landlord does not actually receive at the place designated for payment any rent due under this lease within 5 days after it is due, Tenant will be in default. If Tenant fails to comply with this lease for any other reason within 10 days after Landlord notifies Tenant of its failure to comply, Tenant will be in default.

C. If Tenant is in default, Landlord may, with at least 3 days written notice to Tenant: (i) terminate this lease, or (ii) terminate Tenant's right to occupy the leased premises without terminating this lease and may accelerate all rents which are payable during the remainder of this lease or any renewal period. Landlord will attempt to mitigate any damage or loss caused by Tenant's breach by using commercially reasonable means. If Tenant is in default, Tenant will be liable for:

(1) any lost rent;
(2) Landlord's cost of reletting the leased premises, including brokerage fees, advertising fees, and other fees necessary to relet the leased premises;
(3) repairs to the leased premises for use beyond normal wear and tear;
(4) all Landlord's costs associated with eviction of Tenant, such as attorney's fees, court costs, and prejudgment interest;
(5) all Landlord's costs associated with collection of rent such as collection fees, late charges, and returned check charges;
(6) cost of removing any of Tenant's equipment or fixtures left on the leased premises or Property;
(7) cost to remove any trash, debris, personal property, hazardous materials, or environmental contaminants left by Tenant or Tenant's employees, patrons, guests, or invitees in the leased premises or Property;
(8) cost to replace any unreturned keys or access devices to the leased premises, parking areas, or Property;
(9) any other recovery to which Landlord may be entitled under this lease or under law.

21. **ABANDONMENT, INTERRUPTION OF UTILITIES, REMOVAL OF PROPERTY, AND LOCKOUT:** Chapter 93 of the Texas Property Code governs the rights and obligations of the parties with regard to: (a) abandonment of the leased premises; (b) interruption of utilities; (c) removal of Tenant's property; and (d) "lock-out" of Tenant.

22. **HOLDOVER:** If Tenant fails to vacate the leased premises at the time this lease ends, Tenant will become a tenant-at-will and must vacate the leased premises immediately upon receipt of demand from Landlord. No holding over by Tenant, with or without the consent of Landlord, will extend this lease. Tenant will indemnify Landlord and any prospective tenants for any and all damages caused by the holdover. Rent for any holdover period will be 150% of the base monthly rent plus any additional rent calculated on a daily basis and will be immediately due and payable daily without notice or demand.

Initialed for Identification by Landlord: _R.H, R.H_ and Tenant: _____          Page 10 of 15

(TAR-2101) 1-26-10                                                                                    Untitled

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Commercial Lease concerning: _____

**23. LANDLORD'S LIEN AND SECURITY INTEREST:** To secure Tenant's performance under this lease, Tenant grants to Landlord a lien and security interest against all of Tenant's nonexempt personal property that is in the leased premises or on the Property. This lease is a security agreement for the purposes of the Uniform Commercial Code. Landlord may file a financing statement to perfect Landlord's security interest under the Uniform Commercial Code.

**24. ASSIGNMENT AND SUBLETTING:** Landlord may assign this lease to any subsequent owner of the Property. Tenant may not assign this lease or sublet any part of the leased premises without Landlord's written consent. An assignment of this lease or subletting of the leased premises without Landlord's written consent is voidable by Landlord. If Tenant assigns this lease or sublets any part of the leased premises, Tenant will remain liable for all of Tenant's obligations under this lease regardless if the assignment or sublease is made with or without the consent of Landlord.

**25. RELOCATION:**

☐   A.  By providing Tenant with not less than 90 days advanced written notice, Landlord may require Tenant to relocate to another location in the Property, provided that the other location is equal in size or larger than the leased premises then occupied by Tenant and contains similar leasehold improvements. Landlord will pay Tenant's reasonable out-of-pocket moving expenses for moving to the other location. "Moving expenses" means reasonable expenses payable to professional movers, utility companies for connection and disconnection fees, wiring companies for connecting and disconnecting Tenant's office equipment required by the relocation, and printing companies for reprinting Tenant's stationary and business cards. A relocation of Tenant will not change or affect any other provision of this lease that is then in effect, including rent and reimbursement amounts, except that the description of the suite or unit number will automatically be amended.

☑   B.  Landlord may not require Tenant to relocate to another location in the Property without Tenant's prior consent.

**26. SUBORDINATION:**

   A.  This lease and Tenant's leasehold interest are and will be subject, subordinate, and inferior to:
       (1) any lien, encumbrance, or ground lease now or hereafter placed on the leased premises or the Property that Landlord authorizes;
       (2) all advances made under any such lien, encumbrance, or ground lease;
       (3) the interest payable on any such lien or encumbrance;
       (4) any and all renewals and extensions of any such lien, encumbrance, or ground lease;
       (5) any restrictive covenant affecting the leased premises or the Property; and
       (6) the rights of any owners' association affecting the leased premises or Property.

   B.  Tenant must, on demand, execute a subordination, attornment, and non-disturbance agreement that Landlord may request that Tenant execute, provided that such agreement is made on the condition that this lease and Tenant's rights under this lease are recognized by the lien-holder.

**27. ESTOPPEL CERTIFICATES & FINANCIAL INFORMATION:**

   A.  Within 10 days after receipt of a written request from Landlord, Tenant will execute and deliver to Landlord an estoppel certificate that identifies the terms and conditions of this lease.

   B.  Within 30 days after receipt of a written request from Landlord, Tenant will provide to Landlord Tenant's current financial information (balance sheet and income statement). Landlord may request the financial information no more frequently than once every 12 months.

Initialed for Identification by Landlord: _R.H. R.H._ and Tenant: _____     Page 11 of 15

Commercial Lease concerning: _____

**28. CASUALTY LOSS:**

A. Tenant must immediately notify Landlord of any casualty loss in the leased premises. Within 20 days after receipt of Tenant's notice of a casualty loss, Landlord will notify Tenant if the leased premises are less than or more than 50% unusable, on a per square foot basis, and if Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty loss.

B. If the leased premises are less than 50% unusable and Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty, Landlord will restore the leased premises to substantially the same condition as before the casualty. If Landlord fails to substantially restore within the time required, Tenant may terminate this lease.

C. If the leased premises are more than 50% unusable and Landlord can substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty, Landlord may: (1) terminate this lease; or (2) restore the leased premises to substantially the same condition as before the casualty. If Landlord chooses to restore and does not substantially restore the leased premises within the time required, Tenant may terminate this lease.

D. If Landlord notifies Tenant that Landlord cannot substantially restore the leased premises within 120 days after Tenant notifies Landlord of the casualty loss, Landlord may: (1) choose not to restore and terminate this lease; or (2) choose to restore, notify Tenant of the estimated time to restore, and give Tenant the option to terminate this lease by notifying Landlord within 10 days.

E. If this lease does not terminate because of a casualty loss, rent will be reduced from the date Tenant notifies Landlord of the casualty loss to the date the leased premises are substantially restored by an amount proportionate to the extent the leased premises are unusable.

**29. CONDEMNATION:** If after a condemnation or purchase in lieu of condemnation the leased premises are totally unusable for the purposes stated in this lease, this lease will terminate. If after a condemnation or purchase in lieu of condemnation the leased premises or Property are partially unusable for the purposes of this lease, this lease will continue and rent will be reduced in an amount proportionate to the extent the leased premises are unusable. Any condemnation award or proceeds in lieu of condemnation are the property of Landlord and Tenant has no claim to such proceeds or award. Tenant may seek compensation from the condemning authority for its moving expenses and damages to Tenant's personal property.

**30. ATTORNEY'S FEES:** Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party.

**31. REPRESENTATIONS:**

A. Tenant's statements in this lease and any application for rental are material representations relied upon by Landlord. Each party signing this lease represents that he or she is of legal age to enter into a binding contract and is authorized to sign the lease. If Tenant makes any misrepresentation in this lease or in any application for rental, Tenant is in default.

B. Landlord is not aware of any material defect on the Property that would affect the health and safety of an ordinary person or any environmental hazard on or affecting the Property that would affect the health or safety of an ordinary person, except: ___N/A_____

_____

_____

_____

(TAR-2101) 1-26-10          Initialed for Identification by Landlord: R. H. R. H and Tenant: _____          Page 12 of 15

Untitled

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Commercial Lease concerning: _____

C. Each party and each signatory to this lease represents that: (1) it is not a person named as a Specially Designated National and Blocked Person as defined in Presidential Executive Order 13224; (2) it is not acting, directly or indirectly, for or on behalf of a Specially Designated and Blocked Person; and (3) is not arranging or facilitating this lease or any transaction related to this lease for a Specially Designated and Blocked Person. Any party or any signatory to this lease who is a Specially Designated and Blocked person will indemnify and hold harmless any other person who relies on this representation and who suffers any claim, damage, loss, liability or expense as a result of this representation.

32. **BROKERS:**

A. The brokers to this lease are:

_San SebAsTian Ls. Inc: 559506_          Cooperating Broker _____ License No. _____
Principal Broker          License No.
_Gene Surrency_                              Agent _____
Agent
_PO Box 751653_                              Address _____
Address
_Ho Tx 77275_                                _____
_713 2990105_                  Fax          Phone _____ Fax ____
Phone

E-Mail          License No.          E-Mail _____ License No. _____

                                             Cooperating Broker represents Tenant.

Principal Broker: *(Check only one box)*
[x] represents Landlord only.
[ ] represents Tenant only.
[ ] is an intermediary between Landlord and Tenant.

B. **Fees:**

[x] (1) Principal Broker's fee will be paid according to: *(Check only one box).*
    [x] (a) a separate written commission agreement between Principal Broker and:
        [x] Landlord [ ] Tenant.
    [ ] (b) the attached Addendum for Broker's Fee.

[ ] (2) Cooperating Broker's fee will be paid according to: *(Check only one box).*
    [ ] (a) a separate written commission agreement between Cooperating Broker and:
        [ ] Principal Broker [ ] Landlord [ ] Tenant.
    [ ] (b) the attached Addendum for Broker's Fee.

33. **ADDENDA:** Incorporated into this lease are the addenda, exhibits and other information marked in the Addenda and Exhibit section of the Table of Contents. If Landlord's Rules and Regulations are made part of this lease, Tenant agrees to comply with the Rules and Regulations as Landlord may, at its discretion, amend from time to time.

34. **NOTICES:** All notices under this lease must be in writing and are effective when hand-delivered, sent by mail, or sent by facsimile transmission to:

Landlord at: _Rosa Ann Gial Huerta_
          Address: _3215 Brownway Ho Tx 77011_ Fax: _____
          Phone: _____

and a copy to: _____
          Address: _____ Fax: _____
          Phone: _____
[ ] Landlord also consents to receive notices by e-mail at: _____ N/K _____

Initialed for Identification by Landlord: _R.H. RH_ and Tenant _____          Page 13 of 15

Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com          Untitled

Commercial Lease concerning: _____

Tenant at the leased premises,
and a copy to: _____ *Richard Nichols* _____
     Address: _____ *8307 Park Place Ho TX 77017* _____
     Phone: _____ Fax: _____ *N/A* _____
    ☐ Tenant also consents to receive notices by e-mail at: _____

**35. SPECIAL PROVISIONS:**
*See Attached Exhibit A*
*Option To Purchase - See Attached Exhibit B*

**36. AGREEMENT OF PARTIES:**

A. **Entire Agreement**: This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.

B. **Binding Effect**: This lease is binding upon and inures to the benefit of the parties and their respective heirs, executors, administrators, successors, and permitted assigns.

C. **Joint and Several**: All Tenants are jointly and severally liable for all provisions of this lease. Any act or notice to, or refund to, or signature of, any one or more of the Tenants regarding any term of this lease, its renewal, or its termination is binding on all Tenants.

D. **Controlling Law**: The laws of the State of Texas govern the interpretation, performance, and enforcement of this lease.

E. **Severable Clauses**: If any clause in this lease is found invalid or unenforceable by a court of law, the remainder of this lease will not be affected and all other provisions of this lease will remain valid and enforceable.

F. **Waiver**: Landlord's delay, waiver, or non-enforcement of acceleration, contractual or statutory lien, rental due date, or any other right will not be deemed a waiver of any other or subsequent breach by Tenant or any other term in this lease.

G. **Quiet Enjoyment**: Provided that Tenant is not in default of this lease, Landlord covenants that Tenant will enjoy possession and use of the leased premises free from material interference.

Initialed for Identification by Landlord: *R.H. R.H.* and Tenant: _____    Page 14 of 15

Commercial Lease concerning: _____

H. **Force Majeure**: If Landlord's performance of a term in this lease is delayed by strike, lock-out, shortage of material, governmental restriction, riot, flood, or any cause outside Landlord's control, the time for Landlord's performance will be abated until after the delay.

I. **Time**: Time is of the essence. The parties require strict compliance with the times for performance.

**Brokers are not qualified to render legal advice, property inspections, surveys, engineering studies, environmental assessments, tax advice, or compliance inspections. The parties should seek experts to render such services. READ THIS LEASE CAREFULLY. If you do not understand the effect of this Lease, consult your attorney BEFORE signing.**

Landlord: _Rose Hurwitz_
_Rall. D Hurwitz_

By: _____

By (signature): _____
Printed Name: _____
Title: _____

By: _____

By (signature): _____
Printed Name: _____
Title: _____

Tenant: _Richard Nichols_
By: _Richard Nichols_

By (signature): _____
Printed Name: _____
Title: _TENANT_

By: _____

By (signature): _____
Printed Name: _____
Title: _____

# EXHIBIT A

L/L WILL INSTALL HVAC UNIT ON ROOF

L/L WILL REPLACE OPENING IN THE SIDE OF BUILDING W/CINDER BLOCK WHERE WINDOW UNITS WERE

L/L WILL REPLACE CEILING TILE

L/L WILL REPAIR PARKING LOT IN FRONT OF BUILDING

L/L WILL TURN ON ELECTRICITY AND WATER SO TENANT MAY GET PERMITS AND TENANT WILL PAY LANDLORDS REQUIRED DEPOSITS

L/L WILL PROVIDE TENANT WITH COPY OF INSURANCE ON THE BUILDING

L/L WILL APPROVE OF TENENT PUTTING SIGN ON FRONT OF BUILDING AND POLE AFTER SUBMITTING TO L/L COPY OF SIGN DRAWINGS. SIGNS MUST BE CITY PERMITTED L/L APPROVAL WILL NOT BE UNREASONABLE WITHHELD

L/L WILL ALLOW TENANT AT TENANTS EXPENSE TO INSTALL CITY PERMITTED ROLL UP GARAGE DOORS IN FRONT OF BUILDING AT TENANTS EXPENSE. TENANT WILL PROVIDE DRAWINGS OF DOORS AND DESCRIPTION OF INSTALLATION PROCEEDURES

L/L WILL CAUSE TO BE REPAIRED HVAC UNIT WITHIN 24 HOUR PERIOD AFTER NOTIFICATION OF A PROBLEM

## EXHIBIT B

## PURCHASE OPTION

Landlord grants to Tenant until the end of the first 12 month period an option to purchase the premises, under the following terms and conditions:

a) Tenant may exercise this option only by sending written notice to landlord at 3215 Broadway St., Houston, Texas 77017 by certified mail.

b) The full purchase price for the premises is $125,000.00, payable as follows:
    1) The balance of $125,000.00 less the 10% down payment will be paid according to the terms of a promissory note, payable to the order of Landlord, in 60 equal monthly installments, beginning 30 days after closing, with annual interest on the unpaid amount at the rate of 6% plus prime rate published in the New York Times at the date before the execution of said note.

OR

Landlord grants to Tenant until the end of the first 24th month period an option to purchase the premises, under the following terms and conditions:

a) Tenant may exercise this option only by sending written notice to landlord at 3215 Broadway St., Houston, Texas 77017 by certified mail.

b) The full purchase price for the premises is $125,000.00, payable as follows:
    1) The balance of $125,000.00 less the 20% down payment will be paid according to the terms of a promissory note, payable to the order of Landlord, in 48 equal monthly installments, beginning 30 days after closing, with annual interest on the unpaid amount at the rate of 6% plus prime rate published in the New York Times at the date before the execution of said note.

c)    The promissory note described above will be secured by a deed of trust, which will be a first lien on the premises.

d)    On exercise of this option, all real property taxes levied or assessed against the premises as shown by the latest available tax bill will be prorated between Tenant and Landlord as of the date of closing.

e)    On closing, Landlord will convey to Tenant good and marketable title to the premises, as shown bt a title insurance policy in the full amount of the purchase price, subject to such liens, encumbrances, clouds, and conditions as Tenant ,ay approve in writing. Landlord will pay the cost of the title policy, and Tenant will pay all other closing costs, and the cost of a survey.

*Intrest Not To Exceed 7% Total*

*R.H-*

Landlord will notify Tenant in writing 30 days prior to selling property to another during

option

_Rosa M. Hit_ Landlord

_Rael D Hurtt_ Landlord

_Richard Hitt_ Tenant

2

SAN SEBASTIAN REALTY CO. INC.

DISCLOSURE

THIS DISCLOSURE PERTAINS TO THE LEASE OF THE PROPERTY AT 8304
PARK PLACE HOUSTON, TEXAS 77017, OWNED BY ROSA AND ROEL
HUERTA. DURING THE TIME OF NEGOTIATIONS, IT WAS DECIDEDTHE
AGENT GENE SURRENCY NEEDED TO OBTAIN PARKING RIGHTS FOR THE
LESSEE IN ORDER TO FACILITATE THE LEASE FROM THE OWNERS OF SAID
PROPERTY. THE AGENT RECEIVED NO COMMISSION ON THESE LEASES
FROM THE PARKING ARRANGEMENTS FROM THE LESSEE OR THE OWNERS
OF THE PROPERTY TO BE LEASED FOR PARKING. THE LESSEE HAS ASKED
AGENT FOR A QUOTE ON FIRE AND ALL PERILS AND LIABILITY
INSURANCE POLICY QUOTE FOR THE PREMISES WHICH TEXAS LICENSED
INSURANCE AGENT GENE SURRENCY WILL PROVIDE AND IF ACCEPETED
BY LESSEE, AGENT GENE SURRENCY WILL RECEIVE A COMMISSION FROM
THE INSURANCE AGENCY. LESSEE ASKED GENE SURRENCY FOR
RECOMMENDATIONS FOR VENDING AND BAR EQUIPMENT FOR LESSEE.
SAID BUSINESS AND AGENT WILL MAKE A COMMISSION FROM SAID
VENDORS IF LESSEE DECIDES TO USE SAID REFERRALS. AT NO TIME
DURING THE NEGOTIATIONS OF SAID PROPERTY DID THE REFERRALS
AFFECT THE REAL ESTATE AGENT'S FUDICIARY OBLIGATIONS TO SAID
OWNERS OF PROPERTY FOR LEASE OR SALE BY SAN SEBASTIAN REALTY.
INSTEAD THE REFERRALS ENHANCED THE LEASE NEGOTIATIONS FOR THE
PROPERTY AS IT MADE THE ISSUES EASIER FOR THE LESSEE.

_____          _____ 11-7-12
ROSA HUERTA     DATE              GENE SURRENCY     DATE

_____
ROEL HEURTA     DATE